Rehearing en banc granted by order filed 7/9/98;
published opinion filed 5/13/98 is vacated.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOSEPH H. NORWOOD, individually
and as representative of a class of
citizens,
Plaintiff-Appellant,

v.

No. 96-2164

W. C. BAIN, JR., individually and in
his official capacity as Director of
Public Safety for the City of
Spartanburg Police Department;
CITY OF SPARTANBURG,
Defendants-Appellees.

JOSEPH H. NORWOOD, individually
and as representative of a class of
citizens,
Plaintiff-Appellee,

v.

No. 96-2184

W. C. BAIN, JR., individually and in
his official capacity as Director of
Public Safety for the City of
Spartanburg Police Department;
CITY OF SPARTANBURG,
Defendants-Appellants.

Appeals from the United States District Court
for the District of South Carolina, at Spartanburg.
G. Ross Anderson, Jr., District Judge.
(CA-95-1016-3-7)

Argued: June 5, 1997

Decided: May 13, 1998

Before WILKINS and MICHAEL, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed in part, vacated and remanded in part by published opinion.
Senior Judge Phillips wrote the opinion, in which Judge Michael
joined. Judge Wilkins wrote an opinion concurring in part and dis-
senting in part.

_____

**COUNSEL**

**ARGUED:** W. Gaston Fairey, FAIREY, PARISE & MILLS, P.A.,
Columbia, South Carolina, for Appellant. Andrew Frederick Linde-
mann, ELLIS, LAWHORNE, DAVIDSON & SIMS, P.A., Columbia,
South Carolina, for Appellees. **ON BRIEF:** Rochelle R. McKim,
FAIREY, PARISE & MILLS, P.A., Columbia, South Carolina, for
Appellant. William H. Davidson, II, James M. Davis, Jr., ELLIS,
LAWHORNE, DAVIDSON & SIMS, P.A., Columbia, South Caro-
lina; H. Spencer King, III, Cathy Hoefer Dunn, LEATHERWOOD,
WALKER, TODD & MANN, P.C., Spartanburg, South Carolina, for
Appellees.

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Joseph H. Norwood, individually and as representative of a class,
brought this § 1983 action challenging police conduct at a stop and
search checkpoint set up at the entry to a charity motorcycle rally.
The district court granted declaratory relief but declined to award
damages on Norwood's Fourth Amendment claim stemming from the
physical search of motorcycle riders' clothing and containers and
upheld the temporary seizure of the riders at the stationary check-
point. On the parties' cross-appeals, we affirm, except to the extent
the district court failed to enter an award of nominal damages on the

2

class members' unlawful search claim. As to that, we vacate and remand with instructions to award nominal damages on that claim.

I.

The events giving rise to this action involve a charity motorcycle rally held for the benefit of the American Red Cross ("Red Cross") on September 11, 1994, at the Spartanburg, South Carolina fairgrounds. Sometime in May 1994, as the event's organizers were beginning plans for the motorcycle rally, representatives of the Red Cross and motorcycle clubs from various areas of northwestern South Carolina requested assistance from the Spartanburg Department of Public Safety ("SDPS") in maintaining order at the event. At a planning meeting, Captain Doug Horton of the SDPS was informed that organizers expected up to 3500 participants, possibly including members of two rival motorcycle gangs, the "Hell's Angels" and the "Pagans." After considering the matter, Horton believed that security for the event (which included a motorcycle ride to the fairgrounds followed by a motorcycle show and country music concert) could be provided by twelve to fifteen off-duty officers.

Following up, in July, Horton held a meeting of members of the SDPS's "reserve officers" force who on occasions provided off-duty security service for events. At the meeting, he told them of the possibility that motorcycle gang members might be attending the Rally and asked them to listen out for any information as to possible "problems." Following the meeting, one of the reserve force members, Carl McKinney, sought Horton out and advised him that an unidentified friend at work had told McKinney that an unidentified person had reported to McKinney's friend that a confrontation at the Rally between the Hell's Angel and Pagan gangs was planned. Horton was further advised that gang members could not be visually identified because it was planned that they would "drop their colors"--not wear identifying insignia.

Horton then sought specific advice on motorcycle gang behavior from others. A former police instructor on gang tactics referred him to Lt. Ron Cook of the South Carolina Law Enforcement Division (SLED), who was an expert on motorcycle gangs. Cook responded with information respecting the Hell's Angels and Pagans. Specifi-

3

cally, he advised that they were in an ongoing territorial struggle for "control" of South Carolina gang operations which was then claimed by the Hell's Angels but challenged by the Pagans. As a result, there had been two violent altercations between the groups in recent months, one in Myrtle Beach and one in New Jersey, both of which resulted in physical injuries. Lt. Cook also advised Horton that there were several local area motorcycle gangs affiliated with the Hell's Angels who might be inclined to intervene.

Armed with this information, Horton went in early August to SDPS Chief W.C. Bain and told him for the first time about the upcoming Rally and of the feared potential for trouble. Bain then called a general meeting of the Rally organizers for August 24 to consider the matter of security. Before the general meeting, Bain conferred with Horton and Cook and received from them an update on the situation as they understood it. At the general meeting, Cook repeated the information he had given Horton. Also, at the meeting, Chief Bain announced that the SDPS would take over and be responsible for security at the Rally and that the security measures would include some form of screening for weapons at the entrance to the Rally area.

To this end, Bain had a training session on motorcycle gang behavior patterns conducted for Department officers on September 1. At it, they were instructed on gang identifying marks and insignia and "weapons of choice." These weapons consisted, per the instruction given, of guns and a variety of blunt instruments such as heavy wrenches which were reportedly often carried in motorcycle "saddlebags." Following this session, Cook reported to Bain and Horton on September 6 that he had received information that members of the Hell's Angels would be attending the Rally and that the Pagans had been ordered to join in a ride to an undisclosed location on the day before the scheduled Rally.

Based on the information received, Chief Bain on September 6 directed that all available officers in his department be required to work on the day of the Rally and ultimately assigned 75 for specific security duty at the site. He also requested assistance from other law enforcement agencies, including members of SLED. SLED, on Lt. Cook's recommendation, approved use of one of its helicopters to aid in surveillance, but declined any further participation. According

4

to the testimony of SLED officials, they declined participation because of a determination that the potential for violence, according to their intelligence assessment, did not support a need for the size force otherwise assembled by Bain. Tr. Vol. 1, pp. 188-91. And, they specifically determined not to participate in the entry search procedure directed by Chief Bain, because of general doubts, based on their experience, of its need, and specifically because"due to the information that there would be a large number of family groups and regular civilians at this function, we just felt that our agency would not be involved in screening." Tr. Vol. 1, p. 139.

On the day of the rally, a single checkpoint was established on a public street outside the "cattle gate" entrance to the fairgrounds. The checkpoint was visible from a distance and persons on motorcycles were told that they could enter the fairgrounds on foot without passing through the checkpoint if they parked their motorcycles in the parking lot. Officers were instructed to allow anyone to walk freely through the gates.

Persons on motorcycles, however, were stopped, and had their licenses examined, their licenses and persons videotaped, and some had their motorcycle "saddlebags," or integral motorcycle compartments, or unworn clothing searched for weapons. The original plan had envisioned that physical searches of particular persons and their effects were to be conducted only after a hand-held metal detector (magnetometer) suggested the presence of a weapon in their clothing or on their motorcycles. The proximity of the metal on the motorcycles, however, soon made it apparent that the use of these devices was ineffectual for the purpose and they were abandoned in favor of physical searches of the interiors of saddlebags and unworn clothing. No consent to any of these searches was sought or given. Of the 107 members of the class, 74 had their motorcycle saddlebags, or integral compartments, or unworn clothing searched in this manner.[1] So far as

_____

[1] As revealed by audio-videotapes made at the scene and introduced as evidence at trial, the procedure followed was this. Each motorcycle was stopped at the checkpoint. This sometimes led to long lines of motorcycles awaiting entry. At the checkpoint, all persons on each motorcycle, drivers and passengers alike, were required to provide photographic iden-

5

the record reveals, no weapons were detected at the checkpoint, nor was any member of either of the rival motorcycle gangs identified as such.

Norwood's class action complaint alleged that this conduct violated in various ways the Fourteenth and Fourth Amendment rights of class members and it sought injunctive and monetary relief against the City of Spartanburg and compensatory and punitive damages against Bain in his individual capacity. Specifically, the claim was that stopping the class members at the checkpoint and subjecting them there to extensive videotaping of their persons and licenses was an unreasonable seizure of their persons and that the ensuing physical inspection of the interiors of motorcycle saddlebags and integral compartments

_____

tification to an attending officer. Some had their identifications prepared for display as they reached the checkpoint.

Approximately thirty feet away a video camera operated by a law-enforcement officer filmed the activities. The officer on station took the proffered photographic identifications, confirmed that they resembled the holders and then handed them to the cameraman. The cameraman then held the identification up to the camera, read aloud the individual's name, address, and license number, and handed it back to the first officer.

Sometime during this process, a third and sometimes fourth officer conducted a physical search of some of the riders' motorcycle saddlebags, other closed compartments, and unworn clothing. Most persons stopped at the checkpoint were not wearing jackets but had placed them on the back-ends of their motorcycles. When that was the case, the officer would take the garment, reach inside the pockets, and conduct a physical search of its contents. Similar searches were made of the interiors of integral compartments and attached saddlebags of all motorcycles that had them. These searches were conducted by the officer having the rider open the compartment or saddlebag and then looking inside. In some cases, this involved taking articles out of the container, in others, feeling around inside the container.

At the conclusion of the search, each driver was allowed to enter the fairgrounds. The total process for each motorcycle lasted from one to two minutes. The officers were at all times polite and civil, wishing those stopped "a good day" as they entered the fairgrounds.

6

and the unworn clothing of members of the class was an unreasonable search of their property that violated their Fourth and Fourteenth Amendment rights.[2] Following discovery, the district court denied cross-motions for summary judgment. In doing so, the court rejected Bain's motion for summary judgment on grounds of qualified immunity and concluded that, as a matter of law, Bain was acting as the policy-making official for the City in planning and executing the checkpoint procedures challenged by the class.

The case then went to trial on the Fourth Amendment claims and the defenses raised by Bain and the City. When the jury was unable to reach a verdict, the parties agreed to allow decision by the court on the evidentiary record. The district court concluded that the initial seizure by stopping and videotaping the class members at the checkpoint was reasonable, and so did not violate their Fourteenth and Fourth Amendment rights. The court further concluded that the searches of motorcycle saddlebags and compartments and the riders' unworn clothing were unreasonable in light of the lack of individualized suspicion, and on this basis, gave a declaratory judgment of Fourth Amendment violation by these searches against both Bain and the City. Finding no evidence of actual damages, however, the court declined to award any monetary relief, including nominal damages, for that violation.

Both parties appealed. Norwood challenges the district court's holding that the checkpoint videotaping procedures did not violate class members' Fourth Amendment rights and the court's failure to award any monetary relief for the search violation that the court did find. The City and Bain challenge the district court's entry of declaratory relief on the Fourth Amendment search claim, contending that the court erred both in finding a violation and in concluding that the right violated was clearly established for purposes of Bain's qualified immunity defense.

_____

[2] In addition, the complaint alleged a First Amendment violation, claiming that the search and seizure was an infringement on associational and free-speech rights. The district court rejected this claim on summary judgment and that determination is not challenged in this appeal.

II.

We first address whether the checkpoint procedures other than the physical searches of unworn clothing and closed container interiors violated class members' Fourth Amendment rights. The district court held that they did not and we agree.

Persons stopped for any purpose at motorist "checkpoints" set up by government officials on public highways and streets have been seized for Fourth Amendment purposes. See United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976). If the seizure is not reasonable, it violates the person's Fourth Amendment rights. See Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 450 (1990) ("[Q]uestion [is] whether such seizures are `reasonable' under the Fourth Amendment."). Whether particular checkpoint seizures are reasonable is determined by balancing the gravity of the public interest sought to be advanced and the degree to which the seizures do advance that interest against the extent of the resulting intrusion upon the liberty interests of those stopped. See Sitz , 496 U.S. at 450-55 (confirming and applying balancing analysis as proper test of checkpoint seizures' constitutionality); see also Brown v. Texas, 443 U.S. 47, 50-51 (1979) (recognizing balancing analysis as proper test for constitutionality of all "seizures that are less `intrusive' than a traditional arrest").

Applying this balancing analysis, the Supreme Court has upheld the constitutionality of government checkpoints set up to detect drunken drivers, Sitz, 496 U.S. at 444, and illegal immigrants, Martinez-Fuerte, 428 U.S. at 543, so long as they involve no more than an "initial stop . . . and the associated preliminary questioning and observation by checkpoint officers." Sitz , 496 U.S. at 450-51. In doing so, the Court has determined that the gravity of the public interests that such stops seek to advance and the general efficacy of checkpoint stops in advancing those interests outweigh the minimal intrusions on protected Fourth Amendment liberty interests that are caused by the brief stops required for such limited questioning and observation. But, the Court has also cautioned that "[d]etention of particular motorists for more extensive . . . testing may require satisfaction of an individualized suspicion standard." Sitz, 496 U.S. at 451 (citation omitted). And, applying these general principles, the Court

8

has recognized that an initially reasonable seizure may be transformed into an unreasonable one by further intrusions not based upon individualized suspicion or consent. See United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975).

In recognition of these established principles, Norwood has conceded for purposes of this case that the initial stops effected by this checkpoint, so long as they involved nothing more than the stops themselves and "preliminary questioning and observation by the checkpoint officers" respecting possible weapon possession, would have been reasonable seizures.[3] But, Norwood then contends that the further intrusion on privacy and personal security interests caused by the videotaping procedures made the initially reasonable seizures unreasonable.

The district court concluded--as Norwood has now conceded-- that under the Sitz balancing analysis the initial stop for brief questioning and observation was reasonable in view of the gravity of the public interest and the minimal intrusion upon protected liberty interests such a seizure entailed. And, then addressing Norwood's contention that the videotaping took the intrusion over the line of initial reasonableness, the district court rejected it. In the court's view, because the class members had no reasonable expectation of personal privacy while in a public place, videotaping them at the checkpoint added nothing to the intrusion upon protected interests with which the Sitz balancing analysis is concerned. See JA 695 (order). While we think that view of the matter not an adequate one to meet Norwood's contention, we agree with the ultimate conclusion that the videotaping did not make what is conceded to have been a reasonable initial checkpoint seizure an unreasonable one.

Starting from his concession for purposes of the case that the initial

_____

[3] In view of this concession, we need not address that possible issue. We observe, however, that the situation presented by the merely suspected threat of violence at a local event differs sufficiently from the documented risks of drunken driving on a state's highways and of illegal immigrant crossings of national borders to make the issue, though not necessarily its resolution, a significantly different one than those addressed in Sitz and Martinez-Fuerte .

9

stop for brief questioning and observation would have passed muster under established Fourth Amendment checkpoint jurisprudence, the question raised by Norwood is whether the videotaping procedure so increased this allowable intrusion as to tip the Sitz-test balance. And that, under the established principles, requires looking at both the objective and subjective aspects of this added intrusion. See Sitz, 496 U.S. at 451-52 (recognizing and applying both in assessing extent of intrusion at sobriety checkpoint).

The objective aspect concerns "the duration of the seizure and the intensity of the investigation." See id. at 452. Here, the record indicates that the entire seizure, including that part devoted to the videotaping procedure, lasted no more than a minute or two for any class member. That seems well within tolerable durational limits for any effective weapons checkpoint seizure. Cf. id. at 448 (characterizing 25 seconds for sobriety check seizure as "minimal".)

As to the intensity of this particular aspect of the checkpoint investigation, it actually added nothing to the intensity of that being conducted by the eyes and ears of the checkpoint officers; it merely provided a photographic record of what was being directly observed by those officers. Cf. United States v. Espinoza , 641 F.2d 153, 165-67 (4th Cir. 1981) (affirming admission of photographic evidence made at search scene where officers had legal right to view items). While we do not minimize the added degree of annoyance and resentment surely generated by this procedure, and indeed might question its actual utility for the asserted purpose of intercepting weapons and preventing violence, we nevertheless do not believe it added significantly to the intensity of the investigative procedures.

The subjective aspect of this particular intrusion concerns the degree of "fear and surprise" that it could generate in those subjected to it. See Sitz, 496 U.S. at 452-53. Here again, without minimizing the added degree of aggravation surely generated by this questionably relevant procedure, we do not believe it could possibly have generated the sort of "fear and surprise" with which the Sitz balancing analysis is concerned. The checkpoint was one clearly visible to and readily avoided without penalty by anyone approaching it; the videotaping was not done randomly so as to imply any special interest in particular persons stopped; and it was done in a civil manner that did not

10

involve any element of threat or force. See Martinez-Fuerte, 428 U.S. at 558-59.

Accordingly, though this videotaping procedure may well have pushed to the limit the kind of "brief questioning and observation" that may accompany valid checkpoint seizures without individualized suspicion, we conclude that under the circumstances it did not make unreasonable the checkpoint seizures whose reasonableness in other respects has been conceded for purposes of this case.

III.

We next consider whether the physical searches of the class members' clothing, saddlebags, and integral motorcycle compartments violated their Fourteenth and Fourth Amendment rights. The district court held that they did and we agree.

It is undisputed that these searches of the interiors of closed containers and clothing of motorists stopped at a checkpoint were made without consent, without warrants, and without probable cause (or any lesser form of individualized suspicion). Accordingly, it is axiomatic, and not actually disputed, that the searches violated the Fourteenth and Fourth Amendment rights of these motorcycle riders unless justified by some special circumstance recognized as creating an exception to the warrant and probable cause requirements. See Almeida-Sanchez v. United States, 413 U.S. 266, 270 (1973) (so holding as to vehicle search "conducted in the unfettered discretion of [law enforcement officials], who did not have a warrant, probable cause, or consent") (footnote omitted).

Bain and the City invoke two alternative grounds of justification for the searches: (1) that they were made incident to operation of a constitutionally valid checkpoint; or (2) that they were valid as "administrative searches" regulating access to a sensitive facility in order to prevent harm to those within. We take these in turn, and conclude that neither justified the searches.

A.

The fact that a warrantless, unconsented search of a motorist's effects is made at and incident to a valid non-border checkpoint sei-

11

zure is not, standing alone, a special circumstance allowing it to be made without probable cause. At least since the decision in United States v. Ortiz, 422 U.S. 891 (1975), it has been clear that the limited exception to the individualized suspicion requirement that justifies temporary seizures of motorists at properly operated checkpoints does not serve also to allow searches of the motorists' persons or effects. Ortiz flatly held that "at checkpoint stops removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause." Id. at 896-97 (footnote omitted).

The City attempts to distinguish Ortiz on the basis that the check-point stops at issue in that case were discretionary ones that affected only three percent of passing vehicles, whereas those here affected all motorcycle riders seeking to pass beyond. The Ortiz Court, however, rejected just such an attempted distinction based upon the relatively greater regularity of a particular checkpoint's operation. In holding that such searches were just as unreasonable when made at a randomly-operated checkpoint as were those made by "roving patrols," the Court said that

> [t]he greater regularity attending the stop does not mitigate the invasion of privacy that a search entails. Nor do check-point procedures significantly reduce the likelihood of embarrassment. Motorists whose cars are searched, unlike those who are only questioned, may not be reassured by see-ing that the [authorities] search[ ] other cars as well.

Id. at 895.

Indeed, while the Supreme Court's motorist checkpoint decisions make plain that temporary seizures at regularized motorist check-points may be reasonable, none suggests that more extended seizures of the person, much less searches of the person or his effects may also be conducted without individualized suspicion as an incident of the checkpoint's operation. To the contrary, the Court's decisions have emphasized that to extend checkpoint seizures past the brief time required for "preliminary questioning and observation" or to conduct searches of those seized requires individualized probable cause to arrest or to search. See Sitz, 496 U.S. at 451 (holding that more extended seizure than that associated with initial sobriety checkpoint

12

stop "may require satisfaction of an individualized suspicion standard"); Martinez-Fuerte, 428 U.S. at 567 (holding that after brief questioning at illegal immigrant checkpoint, any further invasive conduct must "`be based on consent or probable cause'") (quoting Brignoni-Ponce, 422 U.S. at 882); see also Wilkinson v. Forst, 832 F.2d 1330 (2d Cir. 1987) (applying above principles in finding indiscriminate pat-down searches of known Ku Klux Klan members entering rally site unconstitutional despite record of violent behavior at similar affairs).

We therefore conclude that the searches were not justified solely because conducted at and as an incident of a regularized checkpoint operation.

B.

Bain and the City principally rely for justification of these suspicionless searches by analogizing them to searches under the formal entry-search programs at airports and sensitive facilities such as courthouses that have been uniformly upheld by the lower federal courts.[4] See e.g., United States v. Epperson, 454 F.2d 769 (4th Cir. 1972) (upholding airport search conducted under precursor to FAA blanket-search program, on modified Terry-analysis); United States v. Edwards, 498 F.2d 496 (2d Cir. 1974) (same; on fact-specific balancing analysis of reasonableness); Downing v. Kunzig, 454 F.2d 1230 (6th Cir. 1972) (upholding courthouse-entry search conducted under GSA blanket search program on comparable reasonableness analysis); United States v. Davis, 482 F.2d 893 (9th Cir. 1973) (upholding airport search conducted under FAA's 1973 blanket search program as a form of "administrative screening search"). The contention is that

_____

[4] The Supreme Court has not had occasion to address directly the constitutionality of such blanket area-entry searches, but recently has observed that blanket suspicionless searches, such as those "now routine . . . at entrances to courts and other official buildings" "may rank as `reasonable'." Chandler v. Miller, 117 S. Ct. 1295, 1305 (1997).

State courts have also generally upheld these blanket search programs on the same basis as have the lower federal courts. See, e.g., People v. Hyde, 524 P.2d 830 (Cal. 1974).

13

the searches here were a comparable form of area-entry search at a sensitive facility that should be upheld on the same basis.

We disagree. The claimed analogy breaks down at every critical point in the proper Fourth Amendment analysis. Whether upholding the airport and courthouse search programs as a species of "administrative search" or under a straightforward fact-specific balancing inquiry into their "reasonableness," the courts have emphasized aspects of those programs that critically distinguish them from the sort of ad hoc localized search procedure employed here.**5**

Specifically, the courts have emphasized the following factors as critical, under a balancing analysis, to the constitutionality of the airport and courthouse searches. First, those searches were conducted

_____

**5** Though it is not directly relevant to our analysis, we observe that there is not a firm consensus as to the exact theory upon which area-entry blanket suspicionless searches may be justified. Some believe that "administrative search" theory as developed in the closely-regulated industry context, see, e.g., United States v. Biswell, 406 U.S. 311 (1972) (licensed gun dealer), is the only viable one since the Terry-justification theory cannot serve because of the lack of any degree of ingoing individualized suspicion. See, e.g., Davis, 482 F.2d at 907-8; see generally 4 W. LaFave, Search & Seizure, § 10.6(c) (3d ed. 1996). Others are wary of importing that theory from the closely-regulated industry context, but consider that the searches can be upheld as "reasonable" under a straightforward balancing of necessity and efficacy against intrusiveness. See Edwards, 498 F.2d at 498 & n.5 (Friendly, J.) (pointing out that importing administrative search theory, while that one"most nearly applicable" to these searches, would present difficulties and holding that airport searches could be upheld by facing directly the"issue of reasonableness").

This court has not had occasion to consider the appropriate theory of justification for blanket entry-point suspicionless searches. For purposes of addressing the contentions of Bain and the City in this case, it suffices that, as Judge Friendly observed in Edwards, the question under any theory ultimately turns on whether such searches are"reasonable" under a traditional balancing analysis. See United States v. Albarado, 495 F.2d 799, 804-05 (2d Cir. 1974) (drawing from both Terry and the "administrative search" decisions in defining airport blanket search issue as "whether in the totality of circumstances such a search is reasonable").

14

under programs formally promulgated by responsible federal agencies for nationwide application under agency oversight. See Davis, 482 F.2d at 896-904 (reciting FAA's role in promulgating and implementing blanket airport search program); Downing, 454 F.2d at 1231 (reciting GSA's comparable role in respect of courthouses and other guarded facilities). The programs addressed on-going risks or threatened risks of violence at these particular facilities whose serious consequences and nationwide scope were fully and indisputably documented in the public records. See, e.g., United States v. Pulido-Baquerizo, 800 F.2d 899, 901 (9th Cir. 1986) (emphasizing statistical evidence of increased risk of terrorism at airports); Downing, 454 F.2d at 1231 & n.1 (taking judicial notice of "outbreaks" of acts of violence at or threatened at federal buildings). The violence experienced or threatened at those facilities was by conduct whose very unpredictability made specific advance identification of its likely perpetrators impossible and blanket searches of all persons seeking entry to the facility therefore the only feasible means of intercepting weapons and explosives. See, e.g., United States v. Moreno, 475 F.2d 44, 48-49 (5th Cir. 1973) (so emphasizing in respect of aircraft hijacking threat).

Finally, and most critically, under those programs physical searches, either of persons or their effects were conducted only after physically unobtrusive electronic screening devices had raised individualized suspicion by indicating the possible presence of weapons or explosives. In consequence, the search procedures involved no more intrusion than was necessary to achieve their limited purpose of preventing entry rather than detecting and apprehending criminals. See Davis, 482 F.2d at 908 (so holding, in upholding airport blanket searches as a form of "administrative screening search"); cf. Albarado, 495 F.2d at 805-06 (applying this requirement in separately assessing magnetometer screening and follow-up physical "frisking" procedures employed under airport search program).

As the courts most intensively analyzing the airport/courthouse blanket search procedures expressly noted, upholding them required recognizing a new exception--spawned by a new national exigency--to the probable cause requirement. See, e.g., Davis, 482 F.2d at 908-12 (pointing out inapplicability of Terry-search exception and relying on "administrative search" analogy); Albarado, 495 F.2d at 803-04

15

(drawing on both <u>Terry</u>-search and "administrative search" precedents to recognize related but new exception). In consequence, what emerged was a carefully constrained special exception of quite narrow scope. It permits blanket suspicionless searches of all persons and their effects at the entry points to particular areas only where: the purpose is the administrative one of preventing the entry of weapons or explosives rather than the detection and apprehension of criminals; the risk of violence from the introduction of weapons or explosives is reliably established as a significant possibility; because of the impossibility of identifying possible carriers by any other practical means, blanket searches of all seeking entry is the only feasible way to achieve the administrative purpose and is demonstrably an efficacious way of achieving it; and the procedure employed is one of which advance notice is given and which, by permitting physical searches only after electronic screening has created individualized suspicion, insures that the means are not more intrusive than required to achieve the purely preventive purpose. <u>See id.</u>

Simply to state the exception is to demonstrate the difficulty of applying it to justify the kind of localized, ad hoc search procedure at issue in this case. Reflecting the difficulty, the federal courts that have been asked to uphold comparable local area-entry searches on this basis have consistently declined to do so, finding the airport/courthouse exception not applicable for various reasons. <u>See</u>, <u>e.g.</u>, <u>Wilkinson</u>, 832 F.2d at 1339-1340 (holding airport/courthouse search exception not applicable to justify first-instance pat-down frisk of all persons seeking entry to violence-threatened KKK rally; preliminary magnetometer screening required to make intrusion reasonable on balance); <u>Wheaton v. Hagan</u>, 435 F. Supp. 1134 (M.D.N.C. 1977) (holding airport-search exception not applicable to random drug and weapons searches of rock-concert patrons at entrance to municipal auditorium: danger posed "substantially less;" procedure not as effective; intrusion greater because random and not preceded by electronic screening); <u>Collier v. Miller</u>, 414 F. Supp. 1357 (S.D. Tex. 1976) (holding airport exception not applicable to random searches for alcoholic beverages and containers of persons attending events at public stadium: risk of violence not equivalent; procedures not as effective; intrusion more substantial because of discretionary administration); <u>Gaioni v. Folmar</u>, 460 F. Supp. 10 (N.D. Ala. 1978) (same, as to random entry searches for drugs and alcohol at civic center rock concert:

16

danger not equivalent; intrusion greater because of discretionary administration; consent from advance notice not constitutionally inferable); Stroeber v. Commission Veteran's Auditorium, 453 F. Supp. 926 (S.D. Iowa 1977) (holding random searches of persons attending rock concert at public auditorium not justified on Terry-analogy: no individualized suspicion established before physical search conducted).**6**

The physical searches here were not justified under the airport/courthouse exception for the same reasons emphasized by these federal decisions. In the first place, the locally-confined, episodic vio-

_____

**6** Bain and the City refer us to no federal decision, and we are aware of none, upholding comparable local area-entry searches. And, they make no effort to distinguish any of the federal decisions uniformly finding them not justified by analogy to the airport/courthouse search decisions or otherwise. They rely only on two state court decisions upholding blanket weapons searches of public school students, People v. Dukes, 580 N.Y.S.2d 850 (N.Y. Cr. Ct. 1992); In the interest of F.B., 658 A.2d 1378 (Pa. Super. 1995), and one upholding, with some critical judicial adjustments, a formally promulgated pre-admittance visual search procedure at a professional football stadium, Jensen v. City of Pontiac, 317 N.W.2d 619 (Mich. App. 1982). Assuming that they properly apply the exception, all three are readily distinguishable on their facts in applying it.

In the school-search cases, as those courts emphasized, the procedures were conducted pursuant to formally promulgated board of education directives; were administered on blanket, non-discretionary bases that utilized mechanical screening before any physical search; and involved public school students having reduced levels of privacy expectation. See New Jersey v. T.L.O., 469 U.S. 325 (1985).

In Jensen as the court properly emphasized, the search procedure was conducted pursuant to a formally promulgated directive by the responsible state agency to deal with a documented, ongoing pattern of serious injuries sustained by spectators from thrown beverage containers; as modified by the court, it required non-discretionary searches of all persons having the visible means of carrying such concealed objects; and it allowed only visual, non-touching inspections of clothing or containers opened upon request by persons who had been given the option of removing any forbidden objects or declining to allow the visual inspection.

17

lence threatened here, hence the public interest in its prevention, was nowhere near the widespread, ongoing violence and commensurate public interest addressed by the federal blanket search programs. Next, the reality and imminence of any violence threatened here was not a matter of documented public record, but was based only on anecdotal, necessarily speculative information the most specific of which was provided third-hand by an anonymous source.[7] Relatedly, the ad hoc search procedure set up to deal with the perceived threat could not be considered a "regulatory scheme" of the sort courts have considered necessary to treating area-entry searches as a species of "administrative search."

The search procedure employed here was not one driven, as were the airport/courthouse search programs, by necessity for lack of any practical alternative means for preventing violence. The record indicates that a not inconsiderable police force had been assembled and was available for patrolling and monitoring the rally area, and that the means for general electronic and helicopter surveillance of the area was also present. Those alternative means obviously may not have been completely effective in preventing the feared violence. That they were available, however, makes it impossible to say here what was thought critical to upholding the airport/courthouse blanket search programs: that there literally was no other feasible alternative having any chance of success. And, in this connection, it is significant that the state law enforcement agency, fully aware of the nature of the threat of violence and of the alternative means available to deal with

_____

[7] By this assessment we do not mean to belittle or second-guess the perception of threatened violence upon which Chief Bain ultimately acted or the precautionary measures that he thought the threat as he perceived it warranted. That the information of an impending confrontation may have been unfounded all along is beside the point. So is the possibility that the threat was a real one that dissipated in the interval. In either event, prudence and responsibility dictated that the threat be treated with the seriousness it received. The question is only whether the final step of conducting suspicionless searches of these claimants' personal effects nevertheless overstepped the bounds of reasonableness established by the Fourth Amendment.

18

it, was doubtful that more was needed and specifically questioned the propriety of the search procedure.**8**

Furthermore, the procedure was not, as conceived, a practically efficacious one for preventing the introduction of weapons by anyone who might be carrying them, or even just by all members of particular suspect groups. Instead, as designed and administered, this procedure was more a sieve than an essentially fool-proof scheme such as the airport/courthouse search programs for preventing entry of any weapons or explosives into a threatened area or facility. Here, only those who sought to ride their motorcycles into the fairgrounds were subjected to the search procedure. Anyone who parked his motorcycle was allowed entry without search. So far as appears, such a person could carry into the area any weapons or explosives that would have been the targets of search at the checkpoint. While it is conceivable that some persons carrying weapons may have been deterred from seeking entry simply because of the known existence of the checkpoint, there is no evidence that even this occurred.

Closely related to this general lack of efficacy in the overall procedure, the checkpoint searches made were not in fact blanket searches even of those who entered the checkpoint. Apparently as a matter of discretionary judgment of those operating the checkpoint, only those persons riding motorcycles that had saddlebags or other closed compartments or who carried unworn clothing were subjected to physical searches. So far as appears, whether one's clothing was searched depended upon whether it was being worn. The whole search procedure at the checkpoint therefore involved a discretionary selective process not based on individualized suspicion and indeed not reasonably adapted to the ultimate purpose.

_____

**8** To justify a warrantless search or seizure as reasonable does not require government proof that no less intrusive means than those employed were available to achieve the asserted purpose of the search or seizure, see Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983); but the availability of such alternatives is relevant to the reasonableness of the government agents' failure to recognize or pursue them, hence to the reasonableness of the search or seizure conducted. See United States v. Sharpe, 470 U.S. 675, 687-88 (1985). It is on the latter basis that we consider the alternatives available here.

19

Finally, the physical searches here were not preceded by any form of unobtrusive mechanical screening giving rise to individualized suspicion. Because such a first-stage, non-physical screening process makes the procedure no more intrusive than necessary to achieve its limited preventive purpose, it has been considered critical by courts upholding as reasonable the airport and courthouse search programs. Its absence here critically distinguishes those decisions and the procedures that they upheld.**9**

We therefore conclude that the district court did not err in holding that the physical searches challenged here violated the Fourteenth and Fourth Amendment rights of those class members who were subjected to them.

IV.

We next consider whether, as Norwood claims, the district court erred in declining to award any monetary relief, including nominal damages, for the Fourth Amendment violation that it found and declared.**10** Specifically, the question presented is whether, under controlling legal principles, the proof supported an award of compensatory damages for actual injury sustained by class members; or, if actual injury was not proved, of "presumed" damages; or if neither

_____

**9** Bain and the City seem to suggest, see Appellees' Br. at 32, that when, as here, preliminary mechanical screening proves infeasible, it is simply excused and suspicionless physical searches thereupon become reasonable under the airport/courthouse blanket search exception. No authority for this suggestion is cited and we do not think it may be implied from the principal decisions recognizing the exception. Beyond that, we do not think that the exception could survive as a reasonable one if such an open invitation to evasion were incorporated.

**10** We must address this issue because without regard to whether, as we discuss in Part IV, Bain was entitled to qualified immunity on the claim for damages, the City remains liable for any damages that may be awarded. The district court's ruling that Bain was the official policymaker for the City in setting up and directing conduct of the checkpoint and that the City was therefore liable for any constitutional violations in its conduct has not been challenged on this appeal. And, the City has no immunity to such an award. See Owen v. City of Independence, 445 U.S. 622 (1980).

was available, at least of nominal damages. We conclude that the court did not err in declining to award compensatory damages either for actual injury proven or as presumed damages, but did err in declining to award nominal damages.**11**

A.

Compensatory damages may be recovered in § 1983 actions for proven violations of constitutional right, but only for any actual harms caused by the violation and not for the violation standing alone. Carey v. Piphus, 435 U.S. 247 (1978) (procedural due process); Memphis Community Sch. District v. Stachura, 477 U.S. 299 (1986) (procedural due process and First Amendment). Actual harms resulting from conduct that violated the right may include economic loss, physical injury, or emotional distress. See, e.g. , Blackburn v. Snow, 771 F.2d 556 (1st Cir. 1985) (emotional distress caused by illegal strip search); Spell v. McDaniel, 824 F.2d 1380 (4th Cir. 1987) (pain and suffering and medical expense caused by police brutality to person in custody).

Here, the district court concluded that no such actual harm resulting from conduct of the physical searches was proven. There was no evidence of any loss of or damage to property nor of any physical injury or even touching sustained in the course of the searches. The only evidence of emotional distress came in the form of testimony by Norwood and four other class members that they felt annoyance, humiliation, and indignity at being subjected to the searches. None testified that their emotional upset was caused by oppressive or threatening conduct by the checkpoint officers; instead, from all that appears, that conduct was civil and non-threatening throughout the process. Under the circumstances, we agree with the district court that this testimony failed to prove emotional distress other than any that may have been experienced as a sense of indignity from the very violation of constitutional right. And, that, as indicated, is not a compensable harm in § 1983 litigation.

_____

**11** Norwood also claimed punitive damages, which the district court of course denied in declining to award any compensatory damages. Because there is no proof of the kind of bad faith or deliberate overreaching that would support such an award, we affirm that ruling without further discussion.

21

Accordingly, the district court did not err in finding that Norwood had failed to prove a compensable actual harm from the physical searches. See Aubin v. Fudala, 782 F.2d 280 (1st Cir. 1983) (comparable failure to prove actual harm from unlawful search of claimants' residence).

B.

In a fall-back position, Norwood contends that if actual harm was not sufficiently proven, the circumstances here were such that an award of substantial "presumed damages" was warranted. We disagree.

Carey and Stachura both acknowledge that in some circumstances, "presumed damages" may be awarded for constitutional violations in the absence of proof of actual harm, though neither found such an award warranted in the circumstances before the court. See Carey, 435 U.S. at 264; Stachura, 477 U.S. at 310-11. This is said in Stachura to occur where compensation is sought "for an injury that is likely to have occurred but difficult to establish." Id. By definition, that situation is not presented where the specific right claimed to have been violated is one whose violation will, if it results in any actual harm, present no difficulty in proving either the harm or its extent. Violation of the specific Fourth Amendment right not to be unreasonably searched that was claimed here is just such a right. There was no inherent difficulty in proving any economic or physical or emotional harm that may have resulted or in quantifying the amount of that harm under established damages law. See Stachura, 477 U.S. at 312 (holding that "no rough substitute for compensatory damages was required" where the existence and extent of any "monetary and non-monetary harms caused by [the constitutional violation]" could properly be assessed by the jury).

The problem here was not that the claim was such that proof either of compensable harm or its extent was inherently difficult, but that proof of actual harm simply was not forthcoming. Accordingly, the district court did not err in declining to award "presumed" damages.

C.

Norwood's final fall-back position is that the class was entitled to an award at least of nominal damages for the found violation. The dis-

22

trict court declined to award even nominal damages on the assumed authority of this court's split panel decision in <u>Ganey v. Edwards</u>, 759 F.2d 337 (4th Cir. 1985). We agree with Norwood that in so ruling, the court erred.

<u>Ganey</u> dealt only indirectly with the specific question of entitlement of right to an award of at least nominal damages once a violation of constitutional right has been established. Its specific holding was only that an award of nominal damages was not necessary to establishing that for attorney fee purposes under 42 U.S.C. § 1988 a claimant was a prevailing party. <u>See Ganey</u>, 759 F.2d at 340. In so holding, the <u>Ganey</u> court did, however, assume that the Supreme Court's decision in <u>Carey</u> had not, as it seemed literally to do, <u>see Carey</u>, 435 U.S. at 267 ("will be entitled"), held that in such circumstances a claimant is entitled of right to an award of nominal damages. <u>See Ganey</u>, 759 F.2d at 340. To the extent <u>Ganey</u> rested on that assumption, it has since been shown to be an erroneous one by the Supreme Court's decision in <u>Farrar v. Hobby</u>, 506 U.S. 103 (1992), which expressly recognized that <u>Carey</u> established the right to a nominal damage award in that circumstance. <u>See id.</u> at 112 ("<u>Carey</u> obligates a court to award nominal damages when a plaintiff establishes the violation of [a constitutional right] but cannot prove actual injury").

Accordingly, we will vacate that portion of the district court's judgment that denies any monetary relief and remand for entry of an award of nominal damages not to exceed $1.00.

V.

There remains the question whether, as Bain contends, the district court erred in holding that he was not entitled to qualified immunity on the physical search claim.[12]

_____

[12] That issue as it now comes to us could be thought to have little legal or practical significance--either to the ultimate result in this case or as a matter of precedent. The award's nominal amount and the fact that in any event the City will remain liable for it makes Bain's immunity a matter of no practical consequence. The limited precedential authority of any fact-specific application of qualified immunity doctrine makes resolution of that issue here of limited legal significance. Be that as it may, the issue is properly presented and requires decision.

23

The basic qualified immunity principles, though not always their application, are clear. Two questions require resolution (if contested): (1) whether the particular right allegedly violated was one clearly established at the time, and (2) if so, whether a reasonable person in the state-official's position would have known that doing what he did (or directed) would violate it. Pritchett v. Alford, 973 F.2d 307, 312-13 (4th Cir. 1992). Because qualified immunity is an affirmative defense, the party asserting it must, to prevail upon it, prove either that (1) the right was not a clearly established one at the time allegedly violated, see Mitchell v. Forsyth, 472 U.S. 511, 535 (1985) or (2) even if the right was then clearly established, a reasonable person in his position could nevertheless have believed that his conduct would not violate it, see Anderson v. Creighton , 483 U.S. 635, 646 n.6 (1987).

In determining whether the right at issue was clearly established (a pure question of law), the proper focus is not upon the right at its most general level but at the level of its application to the specific conduct being challenged. Pritchett, 973 F.2d at 312. And in determining whether a reasonable person in the state-official's position could have believed that what he did (or directed) would not violate that particularized right, a court must take into account the information then actually or constructively in his possession and any exigencies of time and circumstances that reasonably could have affected his perception (possibly a mixed fact/law question). See id. at 312-13.

The right violated here was the Fourth Amendment right not to have one's effects searched by state officials without a warrant, or probable cause, or consent, unless under one of the judicially recognized exceptions such as exigency or border-entry. At its more particularized level, it was the right not to have such a search conducted at an area-entry checkpoint set up, on the basis of information that violence involving weapon use by motorcycle riders might occur at a planned event, to prevent the introduction of weapons by that particular suspect group into the area.

Bain's challenge to the district court's ruling is only to the court's conclusion that the right--which we have now held was violated-- was not, however, at the time a clearly established one. He does not contend that though the right was violated, there were exigencies of

24

time or circumstance that nevertheless made it reasonable for him to believe that ordering and directing the searches would not do so. See id. Nor could he. This is not a situation where a police officer was confronted with a fast-moving situation involving immediate threat to himself or others that required quick action on perhaps a mistaken perception of the true circumstances. In such situations, qualified immunity principles may require finding a resulting violation of right nevertheless excusable as a reasonable one under the circumstances. See, e.g. Gooden v. Howard County, 954 F.2d 960, 967 (4th Cir. 1992) (en banc). That is not the situation here, where Bain's decision was one taken after unhurried deliberation and with ample opportunity for reflection and counsel.

His argument therefore rests entirely on the contention that, as a matter of law, the right violated here was not one clearly established at the critical time. And, specifically, the contention is that it was at least reasonably arguable under then extant law that the searches were justified either because made incident to seizures at a valid motorist checkpoint, or because they were comparable to the airport and courthouse blanket searches that have been upheld under the special exception found warranted in those contexts.

A "survey of the legal landscape" as it then existed directly refutes the contention that among reasonable police officers in Bain's position either exception was even arguably applicable. **13** To demonstrate this, it suffices to recapitulate the survey of relevant decisional law we made in the course of finding the right violated.

The Supreme Court's decision in Ortiz, 422 U.S. at 896-97, had by then flatly held that the mere fact that circumstances justify temporary suspicionless seizures of motorists for observation and questioning at

_____

**13** As we have recognized, though there are obvious differences in the methodology and purposes of the two, our review of the "clearly-established" issue in qualified immunity cases and of the "clearly-established" or "new-rule" issue in application of the retroactivity rule of Teague v. Lane, 489 U.S. 288, 299-310 (1988), involve essentially parallel surveys of the legal landscape. See O'Dell v. Netherland, 95 F.3d 1214, 1223, 1225 (4th Cir. 1996) (en banc), aff'd, 117 S. Ct. 1969 (1997).

25

"motorist checkpoints" does not also justify searches of their vehicles and personal effects without individualized suspicion.

As to whether extant law could reasonably have been thought by "police chiefs of reason" in Bain's position to justify the searches under the airport/courthouse exception, extant decisional law was comparably at odds with the possibility. To summarize: the Supreme Court had not then addressed the reach of that exception past its application in the airport/courthouse context; the one federal court of appeals decision, that of the Second Circuit in Wilkinson v. Forst that had addressed its application to an ad hoc search procedure at a local event had held on facts quite close to those here at issue that it could not be applied to justify previously unscreened physical searches at the entry to a violence-threatened event; at least four federal district court decisions addressing local situations comparable to that here in issue, including one from this circuit, had at that time come to the same conclusion.

Against this array of lower federal court decisions uniformly finding the exception not applicable in local event contexts because of critical intrinsic distinctions from the airport/courthouse context, Bain is unable to cite any federal decision to the contrary and we are aware of none. He relies entirely on three state court decisions: two upholding blanket searches of public school children for weapons and drugs in response to a documented record of weapons and drug-ban violation; the third upholding a tightly constrained consensual inspection of containers capable of carrying beverage bottles into a professional football stadium in response to documented evidence of patron injuries from thrown bottles. Assuming proper application in those cases (irrelevant to the landscape survey purpose) each, as indicated, is critically distinguishable from the situation here at issue. See Part II, ante.

This being the relevant legal landscape at the time in issue, it could be said to support a conclusion that the right here was not then clearly established (because the non-applicability of one or the other exception was not clearly established) only on two bases. First, that police chiefs in Bain's position may not be held to awareness and basic understanding of the principal decisional law that defines that landscape. Second, that missing from this landscape is any authoritative

26

decision flatly holding the airport/courthouse exception not applicable to an indistinguishable factual situation.

The first basis cannot be accepted. While the legal awareness and understanding of police chiefs (and comparable executive officers) cannot be perfectly equated with that of "jurists of reason" in assessing comparable legal landscapes for related purposes, it must be held at least to the basic level posited. The requirement of qualified immunity doctrine that courts in judicial review are to assess that same landscape necessarily assumes that level of accountability.

The second basis has long since been rejected. "`Clearly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." See Pritchett, 973 F.2d at 314.

Accordingly, we conclude that the district court did not err in finding Bain not entitled to qualified immunity.

VI.

We affirm the district court's decisions that the videotaping procedures at the checkpoint did not make the seizures unreasonable; that the physical searches of class members' effects were unreasonable, hence violated their Fourth Amendment rights; that the class members had not proved entitlement to substantial compensatory damage or to punitive damages; and that Chief Bain was not entitled to qualified immunity for the search violation found by the court. We find error in the district court's decision that the class members were not entitled to an award of nominal damages for the proven violation of their rights. We therefore vacate that portion of the district court's judgment and remand with directions to enter a judgment in behalf of those class members whose personal effects were searched for nominal damages not to exceed $1.00.

SO ORDERED

27

WILKINS, Circuit Judge, concurring in part and dissenting in part:

The majority correctly recognizes that, based on the information available to law enforcement, the checkpoint stop and videotaping of Plaintiffs and their driver's licenses by Spartanburg, South Carolina police officers[1] as Plaintiffs entered a fairgrounds for a charity motorcycle rally to benefit the Red Cross was not violative of the Fourth Amendment. However, the majority erroneously determines that the physical search of Plaintiffs' unworn clothing and motorcycle saddlebags violated their rights under the Fourth Amendment. To the contrary, Spartanburg's interest in protecting public safety by preventing members of warring rival motorcycle gangs from carrying concealed weapons into a crowded public event, the extent to which the search reasonably was thought to advance that interest, and the modest degree of intrusion upon those individuals who were subject to the search clearly weigh in favor of a conclusion that the search was reasonable. Accordingly, I would hold that the search did not transgress constitutional bounds. Furthermore, even if the majority were correct that a portion of the search was unconstitutional, Chief of Police Bain nevertheless would be entitled to qualified immunity because it was not clearly established in September 1994, when the rally took place, that this search was unreasonable.

I.

The guarantee of privacy and security from unreasonable governmental intrusion provided by the Fourth Amendment long has been recognized as fundamental to the maintenance of a free society. See Camara v. Municipal Ct. of the City & County of San Francisco, 387 U.S. 523, 528 (1967). The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affir-

---

[1] Plaintiffs named as Defendants the City of Spartanburg and W. C. Bain, Jr., individually and in his official capacity as the Chief of the Spartanburg Police Department. For ease of reference, I refer to Defendants collectively as "Spartanburg."

28

> mation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[2] Simply put, this amendment guarantees that governmental intrusions into privacy by means of searches or seizures will be reasonable. Typically, this reasonableness requirement acts as a constraint on governmental authority to undertake a search or seizure in the absence of individualized suspicion. See Chandler v. Miller, 117 S. Ct. 1295, 1298 (1997). In addition, a search performed without a warrant is unreasonable per se unless it fits within a narrowly defined exception to the warrant requirement. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc). Nevertheless, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989). Instead, a determination of reasonableness compels a weighing of the governmental interest prompting the invasion; the effectiveness of the intrusion, i.e., the degree to which the intrusion reasonably is thought to advance the governmental interest; and the magnitude of the intrusion upon the individuals affected, from both a subjective and objective standpoint. See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 455 (1990); id. at 451-55 (applying test); Von Raab, 489 U.S. at 665 (explaining that when "a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context"). Compare United States v. Davis, 482 F.2d 893, 908-12 (9th Cir. 1973) (explaining that an entry search at an airport was not unconstitutional despite a lack of individualized suspicion or warrant, because a very real chance of danger to the public existed from allowing concealed weapons or explosives onto a commercial airliner, the search method was effective, the degree of intrusion was the least possible to accomplish the goal, and all those entering were subjected to the same treatment), with Wheaton v. Hagan , 435 F. Supp. 1134,

---

[2] The Fourth Amendment is enforceable against the states through the Fourteenth Amendment. See Ker v. California, 374 U.S. 23, 30 (1963).

1145-46 (M.D.N.C. 1977) (holding pat-down searches and searches of purses and clothing for drugs and alcohol by officers stationed at the door of a coliseum were not constitutional because there was little public necessity and the degree of intrusion was high and was exacerbated by the fact that officials exercised discretion concerning whom to search). Here, the question is whether consideration of Spartanburg's interest in public safety, the effectiveness of the search, and the intrusion experienced by the individuals who entered the rally on motorcycles and whose unworn clothing and motorcycle saddlebags were searched weighs in favor of a conclusion that the search was violative of the Fourth Amendment.

A.

The first factor to be considered is the governmental need. "[T]he proffered special need ... must be substantial--important enough to override the individual's acknowledged privacy interest, [and] sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." Chandler, 117 S. Ct. at 1303. The hazard giving rise to the alleged special need must be a concrete danger, not merely a hypothetical one. See id. Although evidence that the problem has manifested itself previously is not always necessary to demonstrate the concreteness of the potential harm, such evidence bolsters an argument that a harm is sufficiently tangible to give rise to a special need. See id. Compare Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 606-08 (1989) (holding that a concrete special need existed for random drug testing in part because of evidence of drug and alcohol abuse by railroad employees), and Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654-65 (1995) (explaining that a sharp rise in drug use by student athletes supported school officials' assertion that random drug testing without individualized suspicion was warranted), with Chandler , 117 S. Ct. at 1303 (noting that Georgia failed to demonstrate concrete harm to support drug testing of candidates for public office in absence of evidence that Georgia had a particular problem with state officeholders abusing drugs).

Although the majority attempts to downplay the amount and reliability of the information Spartanburg possessed, a significant quantity of information indicated a very real possibility of an extremely

30

dangerous situation--an armed confrontation between large numbers of violent, rival motorcycle gang members at a public event. First, reserve officer Carl McKinney learned from a coworker who had been involved with a motorcycle gang that a confrontation between the Hell's Angels and Pagans was planned during the rally and that because the gang members intended to "drop their colors,"[3] law enforcement officers would not be able to identify them. McKinney passed this information along to his superiors. Second, Lieutenant Ron Cook, an expert on motorcycle gangs employed by the South Carolina Law Enforcement Division (SLED), advised Spartanburg that the Hell's Angels and Pagans were engaged in an ongoing conflict for territorial control of South Carolina. He further advised that this turf struggle had led to at least two violent public altercations among gang members during the past several months, one in South Carolina and one in New Jersey. According to Cook, the Pagans had threatened retribution following these incidents. Cook further informed Spartanburg that motorcycle gang members often carry weapons concealed in their motorcycle saddlebags. [4] Third, one of the chairpersons of the event requested that Spartanburg officers investigate an individual whom the chair had learned was planning to attend the event. This investigation disclosed that the individual was a known member and organizer of the Hell's Angels. The chairperson later informed Spartanburg that this individual had expressed an interest in the rally, but would not commit concerning whether the Hell's Angels would attend. Fourth, in the weeks prior to the rally, Cook learned from a Virginia State Police intelligence report that the Pagans had been directed by their leadership to make a mandatory ride to an undisclosed location on the day prior to the Spartanburg rally. Further, Cook received information that the Hell's Angels would be attending a rally in Cherokee, North Carolina scheduled for the same weekend as the Spartanburg rally and that the group planned to attend the Spartanburg rally after leaving North Carolina. Finally, on the evening before the event, one of the chairpersons of the rally

_____

[3] "Colors" are insignia worn to identify membership in a particular motorcycle gang. When members of a motorcycle gang "drop their colors," these insignia are not worn so that identification of the gang member is more difficult.

[4] Cook indicated that the weapons likely to be carried were ball peen hammers with leather straps, large wrenches, and guns.

telephoned a Spartanburg official to advise him that as many as 3,000 to 4,000 bikers from the Cherokee rally were going to converge on the South Carolina event and to express concerns regarding security. Under these circumstances, it cannot be seriously disputed that the governmental interest at stake was an extremely grave and genuine matter of public safety.

The majority argues that because the nature of the harm was local and episodic, public interest in the searches was far less than that supporting blanket searches at airports and courthouses pursuant to nationwide regulations. Of course the majority is correct that the type of harm presented here was different in scope from that justifying searches at airports and courthouses, but so was the scope of the search. I do not suggest that the danger faced by Spartanburg would warrant checkpoint searches at all motorcycle rallies nationwide or at all large public events conducted in Spartanburg. Because there was no attempt to justify a search of nationwide scope, it is mystifying why the majority believes it necessary to focus on whether a special need that was national in extent was present. Cf. Vernonia Sch. Dist. 47J, 515 U.S. at 648-50, 654-65 (applying balancing test to hold that a local drug testing program for student athletes was constitutional despite lack of warrant or individualized suspicion).

The majority also faults Spartanburg for implementing the checkpoint search based on information supplied to law enforcement officers rather than evidence presented to a legislative or administrative body and memorialized in public records. But, a rule that a special need cannot support a search absent a harm established in public records is artificial and unworkable. Undoubtedly, a warrantless search designed to avert great harm, which could be avoided only by an extremely unintrusive type of search applied in a very evenhanded manner would be reasonable and thus would not violate the Fourth Amendment simply because it was not authorized by legislation or a regulatory scheme. For example, suppose law enforcement officials received reliable information that two individuals were transporting a large quantity of explosives by vehicle into a specified city by a specified route in order to blow up a museum where a popular, but controversial, exhibit was on public display. Obviously, under these facts a massive danger to public safety exists that could be averted only by intercepting the would-be bombers. Balancing the severity of the

32

harm, the effectiveness of the proposed response, and the minimal intrusion to the individuals subjected to a search leads to one conclusion. Law enforcement officials could properly stop all motorists traveling into the area on the identified route and conduct a cursory search of the interior and trunk of the vehicles. Such action would be reasonable and within constitutional bounds.

Under the circumstances presented here, a special governmental interest existed in protecting the public. Spartanburg possessed concrete information that armed, rival motorcycle gangs, the members of which could not be identified, planned to attend the rally. And, the potential for a violent eruption appeared real in light of past altercations between the two groups. Given the large number of participants expected for the rally and the potential for a massive, violent confrontation, Spartanburg clearly possessed a genuine and substantial need to safeguard the public.

B.

The second factor, the effectiveness of the search, focuses on "the degree to which [it] advances the public interest." Sitz, 496 U.S. at 453 (internal quotation marks omitted). Compare Chandler, 117 S. Ct. at 1304 (noting that "Georgia's certification requirement [was] not well designed to identify candidates who violate antidrug laws" because the testing date was known in advance so that abusers could refrain from using drugs prior to the test), with Vernonia Sch. Dist. 47J, 515 U.S. at 663 (explaining that random drug testing of student athletes was an effective means of addressing a drug abuse problem in the student body as a whole because the problem was caused at least in part by students' imitation of the student athletes' drug use). In analyzing this factor, however, we recognize that our review must leave "the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger" to "the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." Sitz, 496 U.S. at 453-54.

There can be little question that searching Plaintiffs' unworn clothing and motorcycle saddlebags was an effective means of preventing the type of weapons motorcycle gang members were purportedly car-

33

rying from finding their way into the public fairgrounds. Indeed, no other law enforcement effort would have worked as well. Because the metal detectors the officers first attempted to employ in order to avoid individualized searches were ineffective, an effective method of search less intrusive than the one employed was not possible. And, without the checkpoint search, Spartanburg would not have obtained individualized suspicion that specified individuals possessed weapons until the gang members already had entered into the fairgrounds, become a part of the large crowd, and brandished or used their weapons. By that time, the threat of a violent confrontation would have been fully realized. See Davis, 482 F.2d at 910 (noting in support of a conclusion that airport checkpoint searches are constitutional that "[l]ittle can be done to balk the malefactor after [weapons or explosives are] successfully smuggled aboard[ a commercial aircraft], and as yet there is no foolproof method of confining the search to the few who are potential hijackers").

Furthermore, the fact that individuals were permitted to walk into the fairgrounds without being searched provided that they parked their motorcycles outside the fairgrounds does not mean that the search method employed was ineffective.[5] Cf. McMorris v. Alioto, 567 F.2d 897, 899 (9th Cir. 1978) (search must be no more intrusive than necessary to be reasonably effective). The information available to Spartanburg indicated that motorcycle gang members not infrequently carried weapons in their motorcycle saddlebags. Thus, it was reasonable for Spartanburg to conclude that the likelihood for the transportation of weapons into the fairgrounds was less for individuals who parked their motorcycles outside and walked to the rally. And, it is important to realize that these weapons could not have been concealed easily in the tight T-shirts and blue jeans--or less--worn by the majority of the bikers on that very hot September afternoon. Additionally, even if reasonable law enforcement officials could have concluded that a search of the individuals entering the fairground on foot would have been more thorough, it is not within our province to question the decisions of officials concerning a choice of law enforcement techniques among reasonable alternatives.

_____

[5] It is worth noting that Cook was stationed outside the pedestrian entrance gate to attempt to identify any notorious gang members entering on foot.

34

C.

Finally, the degree of intrusion, both objective and subjective, suffered by individuals submitting to the search indicates that the checkpoint search of Plaintiffs' unworn clothing and motorcycle saddlebags was constitutional. The objective intrusion suffered by an individual is "measured by the duration of the seizure and the intensity of the investigation." Sitz, 496 U.S. at 452. The subjective level of intrusion measures how the method chosen minimizes or enhances fear and surprise on the part of those searched or detained. See id. Here, the objective intrusion experienced by Plaintiffs was certainly more than minimal. While the searches were very brief, the intensity of a visual search of the interior of private belongings undoubtedly was objectively intrusive. However, the intrusiveness of the search was lessened by the fact that the entrants to the fairgrounds were informed that they would be subjected to the search only if they wished to enter on motorcycle and would be permitted to enter without a search if they chose to park their motorcycles and enter as pedestrians. All of those who entered the fairgrounds on motorcycles with unworn clothing or saddlebags were subjected to the search. See id. (explaining that a checkpoint search where all entrants are searched is considerably less intrusive than a search by roving patrols that exercise discretion over whom to stop and search); see also Turner v. Dammon, 848 F.2d 440, 446-47 (4th Cir. 1988) (explaining that "[t]he cases upholding warrantless administrative searches clearly establish that these rules require certainty, regularity, and neutrality in the conduct of the searches"). Accordingly, the search was no more intrusive than that required to protect against the harm Spartanburg sought to avoid. See McMorris, 567 F.2d at 899; see also Wilkinson v. Forst, 832 F.2d 1330, 1340-41 (2d Cir. 1987) (holding that pat-down searches for weapons of all entrants into a Ku Klux Klan rally were excessive, that future searches by magnetometer were permissible, and "that more intrusive measures might be justified by future events").

D.

In sum, a genuine and substantial threat to public safety existed that created a special need beyond that of the traditional law enforcement goals of apprehension and detection of criminal conduct; the method chosen to address that need effectively advanced the public interest

35

in a manner that could not have been equaled by a scheme requiring individualized suspicion or a warrant; and the intrusion suffered by those individuals who submitted to the search, while not insignificant, was no greater than necessary to achieve the desired goal. Therefore, a balancing of these factors clearly demonstrates that the search conducted was reasonable and thus not violative of the Fourth Amendment.**6**

_____

**6** The decision of the Supreme Court in United States v. Oritz, 422 U.S. 891 (1975), and the decision of this court in United States v. Gallagher, 557 F.2d 1041 (4th Cir. 1977) (per curiam), are not to the contrary. In Ortiz, in addressing whether a checkpoint search of vehicles for illegal aliens that was not conducted at the border or its functional equivalent was constitutional, the Supreme Court remarked that "at traffic checkpoints removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause." Ortiz, 422 U.S. at 896-97. In Gallagher, we echoed this concern stating:

> [There is a] long-recognized distinction between border searches and those taking place in interior locations. "Travellers may be ... stopped in crossing an international boundary because of national self protection ...." "[S]earches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well." At points other than the border or its functional equivalent, however, officers may not search private vehicles absent consent or probable cause.

Gallagher, 557 F.2d at 1043 (citations omitted) (second & fourth alterations in original).

Despite their broad language, Ortiz and Gallagher can be distinguished. First, the Ortiz Court did not apply the Sitz balancing test. Second, an application of that test to the facts of Ortiz leads to the conclusion that the searches at issue there were violative of the Constitution. Finally, and most importantly, Ortiz addressed the situation presented when law enforcement officers attempt to justify a traffic checkpoint search by reference to illegal alien interdiction efforts. Because Ortiz was addressing only a checkpoint to prevent illegal immigration, it does not address whether there could be other potential harms that might justify checkpoint searches of automobiles for other reasons. Additionally, in Gallagher, this court held that the search at issue was a border search, so its statement concerning searches away from the border was dictum.

36

II.

Even if the majority were correct that Spartanburg deprived Plaintiffs of their Fourth Amendment rights by searching their unworn clothing and motorcycle saddlebags at the entrance checkpoint, the question remains whether Chief of Police Bain should be held personally liable for damages. Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." E.g., Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Maciariello v. Sumner , 973 F.2d 295, 298 (4th Cir. 1992). Thus, although the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest. See Anderson v. Creighton, 483 U.S. 635, 640 (1987); Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992) (explaining that "[t]he fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was nevertheless `clearly established' for qualified immunity purposes" and that "`[c]learly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked"). As we recently reiterated, "[t]he law is clearly established such that an officer's conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." Wilson v. Layne, 1998 WL 159673, *2 (4th Cir. Apr. 8, 1998) (en banc) (internal quotation marks omitted).

In analyzing an appeal from the rejection of a qualified immunity defense, the first task of the court is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct. See Taylor v. Waters, 81 F.3d 429, 433 (4th Cir. 1996). The court then must consider whether, at the time of the claimed violation, that right

37

was clearly established and "`whether a reasonable person in the official's position would have known that his conduct would violate that right.'" Id. (quoting Gordon v. Kidd , 971 F.2d 1087, 1093 (4th Cir. 1992)). Review by this court of the denial of summary judgment based on qualified immunity is de novo. See Pritchett, 973 F.2d at 313.

The constitutional right that Plaintiffs claim was violated, defined at the appropriate level of specificity, is their Fourth Amendment right to avoid unreasonable searches or seizures resulting from the individualized checkpoint search of their unworn clothing and motorcycle saddlebags for the purpose of detecting weapons when reliable information indicated that a real danger existed that armed members of warring motorcycle gangs planned to attend the rally. The qualified immunity question presented, then, is whether in September 1994 this right was clearly established and whether a reasonable officer would have understood that the conduct at issue violated it.

As the majority recognizes, when this incident took place, there was no clear law from the Supreme Court, this court, or the South Carolina Supreme Court addressing whether officers violate the Fourth Amendment by conducting an individualized search at a checkpoint--without individualized suspicion or a warrant--when a grave matter of public interest is at stake, an effective means of preventing that harm is available, and the searching technique employed is no more intrusive than necessary to prevent the harm feared. The Supreme Court had announced, however, that this balancing test was the appropriate one to assess the reasonableness of a search conducted without individualized suspicion or a warrant. Under this authority, a reasonable law enforcement officer may well have concluded that this type of search was constitutional as analogous to administrative searches at airports or courthouses. In my opinion, at most the question of whether the constitution was violated by the officers' conduct was a matter over which reasonable jurists arguably could disagree. And, if the answer to this question was not clearly established, a reasonable officer in Bain's position could not have known what it was. See Wilkinson, 832 F.2d at 1342 (holding officers were entitled to qualified immunity on similar facts).

38

III.

In sum, I would hold that neither portion of the checkpoint search --the videotaping of the individuals who entered the fairgrounds by motorcycle and their driver's licenses nor the individualized search of Plaintiffs' unworn clothing and motorcycle saddlebags--violated the Fourth Amendment. In addition, even if the majority were correct that the individualized search violated constitutional bounds, Bain would be entitled to qualified immunity.