**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JAMES DESROCHES, II, a minor, by
his father and next friend, James
DesRoches,
Plaintiff-Appellee,

v.                                                No. 97-2173

MICHAEL CAPRIO; ROY D. NICHOLS,
JR.; SCHOOL BOARD OF THE CITY OF
NORFOLK,
Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Robert G. Doumar, Senior District Judge.
(CA-97-460-2)

Argued: May 6, 1998

Decided: September 23, 1998

Before MURNAGHAN and HAMILTON, Circuit Judges, and
MICHAEL, Senior United States District Judge
for the Western District of Virginia,
sitting by designation.

_____

Reversed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Hamilton and Senior Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Harold Phillip Juren, Senior Deputy City Attorney, Nor-
folk, Virginia, for Appellants. Mary Catherine Bauer, ACLU OF

VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Jacob P. Stroman, IV, Deputy City Attorney, Norfolk, Virginia, for Appellants. Frank Morris Feibelman, FEIBELMAN & ERDMANN, Richmond, Virginia; Brett Loney, SEGALL & MOODY, Newport News, Virginia, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Appellants, Principal Michael Caprio, Superintendent Roy Nichols, Jr., and the City of Norfolk School Board, appeal the judgment of the district court finding a violation of the Fourth Amendment arising from the suspension of Appellee, James DesRoches, Jr. (DesRoches), following his refusal to consent to a search of his backpack by school officials investigating a missing pair of tennis shoes. Because we believe the proposed search was reasonable under the circumstances, we reverse.

I.

On May 2, 1997, James DesRoches was a ninth-grade student at Granby High School, a public high school in Norfolk, Virginia. On that day, he attended his fourth period art class, which met for half an hour before and after lunch. During the first half of class, one of the nineteen students in the class, Shamra Hursey (Hursey), placed her girls' tennis shoes on top of her desk. While the students went to lunch, Hursey left her shoes unattended in the classroom.

During lunch, the art classroom was unlocked, and the teacher remained in the classroom. For a "very short" portion of the time, however, the teacher was in a closet in the classroom cutting paper. (J.A. 69). The teacher could not see out of the closet into the classroom, but she stated that while she was in the classroom she never saw any students whom she did not know. One student in the classroom during the lunch period, however, testified that a student who was not enrolled in the fourth period art class was in the classroom during lunch. A few other students who were enrolled in the class returned to the classroom for a few minutes during lunch.

2

Upon Hursey's return from class, she noticed her shoes were missing. DesRoches and others assisted Hursey in looking for the shoes. When the shoes were not found, Hursey reported the shoes as stolen to the school's Dean of Students, James Lee, whose responsibilities include attending to matters of school security. Lee was aware that a ring had been reported missing in the same class the day before.

Upon arriving at the classroom, Lee spoke in the hallway with the class's teacher, Ms. Ratliffe, who informed him that, to her knowledge, only three students had remained in the classroom during lunch. When interviewed, those students informed Lee that Hursey had placed the shoes on her desk before the lunch period and that they were unaware of what might have happened to the shoes during lunch.

From his talks with these people, it was Lee's understanding that there had been students in the art classroom at all times during lunch, that the teacher knew all these students, that none of the students had been left alone in the classroom, and that the teacher was in the classroom at all times. It is also clear from the record that, although a student testified at trial to (1) seeing DesRoches in the cafeteria or courtyard during the lunch break; (2) seeing DesRoches with his backpack during lunch; and (3) whether DesRoches returned to the classroom after Shamra, no one told Lee anything about this at or before the time of the search.

On the basis of what he had learned during his investigation, Lee determined that it was necessary to conduct a search of the personal belongings of all nineteen students in the class. He announced his intention to search, asking whether anyone objected. At that point, DesRoches and another student raised their hands. When Lee reminded them that school policy authorized a ten-day suspension for a student's refusal to consent, the other student provided his consent but DesRoches continued to refuse. Lee told DesRoches "that he could just sit there and [they] would talk about it later," and then proceeded to search the bags and backpacks of the consenting students. Because those searches were unfruitful, Lee escorted DesRoches to the principal's office where the school's principal, Michael Caprio, renewed Lee's request to search DesRoches's backpack. When DesRoches refused, Caprio allowed him to call his parents in the unreal-

3

ized hope that they would convince him to change his mind. Des-Roches was then suspended for ten days, commencing immediately.

On May 8, 1997, DesRoches filed this action by his father and next friend, pursuant to 42 U.S.C. § 1983, seeking injunctive relief, monetary damages, and attorneys fees, on the grounds that the school officials had violated his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution. On May 12, 1997, the district court heard testimony on the matter in response to Des-Roches's request for a preliminary injunction. Before the court rendered a decision in that matter, the parties reached a compromise in which DesRoches was to be readmitted to school pending a final hearing and decision by the district court.

The case proceeded to trial on May 28, 1997. The court dismissed DesRoches's claim for money damages on the grounds that defendant Caprio was entitled to qualified immunity and that the defendant school board and superintendent were immune from money damages under the 11th Amendment. The court then dismissed DesRoches's First and Fourteenth Amendment claims but concluded that the school's actions constituted an unreasonable search in violation of the Fourth Amendment. The court granted injunctive relief requiring the school board to reinstate DesRoches and to expunge the suspension from his record. This appeal followed.[1]

II.

The sole issue presented on appeal is whether the district court erred in concluding that the proposed search of DesRoches was unreasonable under the Fourth Amendment. Appellants answer that question in the affirmative, arguing that Lee's demand to search DesRoches was reasonable under the circumstances.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const.

_____

[1] On appeal, DesRoches does not challenge the grant of qualified immunity to Caprio or the dismissal of his claims under the First and Fourteenth Amendments.

4

amend. IV. Although it was once open to debate whether that protection extends to school children, the Supreme Court held for the first time in New Jersey v. T.L.O., 469 U.S. 325 (1985), that searches and seizures conducted on school premises by school officials are governed by the limits of the Fourth Amendment, see id. at 336-37. In reaching that conclusion, the Court rejected the notion that school officials act purely in loco parentis over school children. See id. ("In carrying out searches and other disciplinary functions . . ., school officials act as representatives of the State, . . . and they cannot claim the parents' immunity from the strictures of the Fourth Amendment.").

Searches and seizures carried out by school officials are governed by the same Fourth Amendment principles that apply in other contexts. See id. at 337. As a starting point, the Court has repeatedly emphasized that "[t]o be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." Chandler v. Miller, 117 S. Ct. 1295, 1301 (1997); see also Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 624 (1989). Exceptions to that requirement have been upheld only in "certain limited circumstances," Chandler, 117 S. Ct. at 1298 (citation omitted), where the search is justified by "special needs, beyond the normal need for law enforcement," id. at 1301 (citation omitted). Where the government asserts "special needs"-- defined as "concerns other than crime detection" -- as justification for a suspicionless search, "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Id. at 1301 (citation omitted). The search will be upheld only where the government's interests in conducting the search are "substantial -- important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Four Amendment's normal requirement of individualized suspicion." Id. at 1303; see, e.g., Camara v. Municipal Court, 387 U.S. 523 (1967) (upholding suspicionless, random code-enforcement inspections where justified by health and safety concerns and where requirement of individualized suspicion would render search regime ineffectual); Skinner, 489 U.S. at 630-31 (upholding suspicionless urinalysis of railroad employees following train accidents where compelling interest in preventing accidents from occurring would not be served by requirement of individualized suspicion).

5

The Supreme Court laid the ground rules for suspicion-based school searches in T.L.O. There, the Court held that the constitutionality of school searches based on individualized suspicion would be evaluated by the two-pronged reasonableness standard first announced in Terry v. Ohio, 392 U.S. 1, 20 (1968). See T.L.O., 469 U.S. at 341. Pursuant to that standard, the reasonableness of a search is determined by considering first "whether the .. . action was justified at its inception," id. (quoting Terry, 392 U.S. at 20), and second, "whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place,'" id. (quoting Terry, 392 U.S. at 20).

T.L.O. did not hold that individualized suspicion is an essential element of reasonableness for all school searches. See id. at 342 n.8. The Court found it unnecessary to address that issue since any requirement of individualized suspicion was easily satisfied by the facts presented in that case. See id. Nevertheless, the Court cautioned that, as in other contexts, a search conducted in the absence of individualized suspicion would be reasonable only in a narrow class of cases, "where the privacy interests implicated by a search are minimal and where `other safeguards' are available `to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field.'" Id. (quoting Delaware v. Prouse, 440 U.S. 648, 654-55 (1979)).

Recently, in Vernonia School Dist. 47J v. Acton , 515 U.S. 646 (1995), the Supreme Court was called upon for the first time to assess the validity of a suspicionless school search. The case arose from a school district's decision to implement a random drug-testing program for student athletes in an effort to curb a documented increase in the use of drugs among students. See id. at 648-50. Because the district's program was not based on individualized suspicion, T.L.O. was inapplicable. Instead, the Court analyzed the reasonableness of the program by balancing the students' legitimate privacy interests against the government's interests in conducting the search. See id. at 661. As the Court explained, the fundamental inquiry in such cases is whether the government's interest is "important enough to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy." Id. (emphasis omitted). Applying that standard, the Court con-

6

cluded that the government's demonstrated interest in fighting drug abuse among student athletes -- who, more than others, are at risk of physical and psychological harm resulting from the use of illicit drugs -- was sufficiently weighty to justify the modestly intrusive drug testing of student athletes who, by virtue of their voluntary participation in what is essentially a "highly regulated industry," enjoy a lessened expectation of privacy when compared to students in general. See id. at 661-62, 664-65.

The Court's decision in Vernonia may be contrasted with its holding in Chandler v. Miller, 117 S. Ct. 1295 (1997), in which the Court struck down a Georgia statute requiring suspicionless urinalysis of all candidates for public office, see id. at 1302-05. In reaching that conclusion, the Court emphasized that although the statute was intended to deter drug use by candidates and to assure the public of the integrity and clear-mindedness of its elected officials, the state had failed to provide "any indication of a concrete danger demanding departure from the Fourth Amendment's main rule." Chandler, 117 S. Ct. 1303. Not only did Georgia fail to demonstrate that the state had a current problem of drug abuse among public officials, see id., elected officials "typically do not perform high-risk, safety sensitive tasks, and the required [urinalysis] immediately aids no[drug] interdiction effort," see id. at 1305. Thus, in closing, the Court emphasized that "blanket, suspicionless searches calibrated to[a certain] risk" are acceptable "where the risk to public safety is substantial and real" -- for example, routine searches at the entrances to airports and courthouses. Id. at 1305. "But where, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged." Id.

In the case at bar, the district court properly analyzed the reasonableness of the school's actions in light of the above principles. The district court recognized that, in some situations, a group of students may be so small that the entire group may be searched without violating the individualized suspicion requirement (citing T.L.O., 469 U.S. at 346) ("sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment"). Then the court searched for individualized suspicion. After concluding that the proposed search was not based on individualized suspicion, the court analyzed the case according to the "special needs" inquiry laid out in Vernonia,

7

Chandler, and other cases in which the government has offered a compelling government interest as justification for a suspicionless search. The court concluded that the circumstances facing school officials at the time of the search -- theft of personal property not posing a risk of imminent harm to students or school personnel -- were insufficient to justify the substantial invasion of privacy that would occasion the proposed search. We review de novo the district court's legal conclusions with respect to the reasonableness of the school's actions. See United States v. Carter, 139 F.3d 424, 426 (4th Cir. 1998). The district court's factual findings are reviewed for clear error. See United States v. Rusher, 966 F.2d 868, 873 (4th Cir. 1992).

The Supreme Court has held that the existence of Fourth Amendment protections depends on whether the individual has a legitimate expectation of privacy in the thing or place to be searched. See Rakas v. Illinois, 439 U.S. 128, 143 (1978). Like members of the public generally, schoolchildren enjoy a legitimate expectation of privacy in their persons and effects. See T.L.O., 469 U.S. at 338 ("Although this Court may take notice of the difficulty of maintaining discipline in the public schools today, the situation is not so dire that students in the schools may claim no legitimate expectations of privacy."). In T.L.O., the Court emphasized that, in the adult world, "even a limited search of the person . . . [or] of closed items of personal luggage" is a "substantial invasion of privacy." Id. at 337 (citations omitted). The same is equally true, the Court held, with similar searches conducted on school children, since "[a] search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy," id. at 337-38, which expectations society recognizes as "legitimate," id. at 339 ("[S]choolchildren may find it necessary to carry with them a variety of legitimate, noncontraband items, and there is no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds.").**2** Therefore, in the present case, there is no

_____

**2** Ensuring that students enjoy such privacy is not only constitutionally mandated, it is critical to the proper development of young minds. See T.L.O., 469 U.S. at 334 ("That [school officials] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.") (quoting West Virginia State Bd. of Ed. v. Barnette, 319 U.S. 624, 637 (1943)).

8

question but that DesRoches enjoyed a legitimate expectation of privacy in his backpack so as to trigger the protections of the Fourth Amendment.

The next question, then, is whether the proposed search of the backpack was reasonable under the circumstances. Consistent with our discussion above, we begin by determining whether the search was supported by individualized suspicion. Our analysis of that question is guided by T.L.O. There, the Court explained that the first step in the reasonableness inquiry is to determine whether the search was "justified at its inception," which requires us to determine whether there were "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." 469 U.S. at 341-42.

In the present case, where consent to search was requested and the individual was later punished for refusing consent, we are faced with the threshold issue of what constitutes the "inception" of the search. Not surprisingly, the parties offer competing views of the matter. DesRoches argues that the inception of the search occurred when school officials first announced their intention to search the class. He maintains, therefore, that the reasonableness of the school's actions must be judged by the circumstances known to school officials prior to their search of the first student. Appellants, on the other hand, argue that the inception of the search occurred not at the moment DesRoches was threatened with suspension, but at the moment he was actually suspended for refusing to consent. Therefore, while Appellants concede that individualized suspicion was lacking with respect to DesRoches when the search was first announced to the class, they maintain that such suspicion had arisen by the time DesRoches was punished for refusing to consent to the search.

The district court agreed with DesRoches. In the court's opinion, "allowing [DesRoches] to be searched after the fruitless search of the consenting students compromises the principle that a search's reasonableness must be judged at its inception." As the court saw it, "[a] bifurcated search (first of the consenters, then of the non-consenters) guarantees that the search of the non-consenting students would be judged . . . after the inception of the search of all the other students." Such an arrangement, the district court believed, would allow "[o]ne's

9

constitutional rights . . . [to] wax and wane according to whether others stand upon their . . . rights."

We respectfully disagree. Underlying the district court's reasoning is the premise that school officials conducted but one search of nineteen students, such that the reasonableness of the school's actions must be judged in the aggregate. We believe that premise is flawed, since school officials conducted not one but nineteen individual searches, each of which must be independently assessed for its reasonableness. Therefore, whether any given search was justified at its inception must be adjudged according to the circumstances existing at the moment that particular search began, rather than, as the district court believed, the circumstances existing when the first student in the class was searched.

DesRoches argues that the inception of the search, as directed against him, occurred when school officials threatened him with suspension after he refused their request to search his backpack, because at that point he was required to choose between the proposed search and the possibility of suspension. We believe that argument misses the mark. For DesRoches to maintain a Fourth Amendment claim, there must have been an infringement on a protected Fourth Amendment interest. While we agree, of course, that <u>actual</u> suspension for refusal to consent constitutes such an infringement when the proposed search is unreasonable, we cannot agree that the Fourth Amendment is implicated merely by a demand to search coupled with threats of punishment, where the threats are unsuccessful in bringing about the individual's consent.

DesRoches contends that his punishment became final when he refused, for the second time, to consent to the requested search, after being warned that his refusal to do so would result in a ten-day suspension. He argues, in essence, that his punishment was automatically imposed when he refused to provide his consent. Yet, the facts do not support such a contention. Far from automatically punishing DesRoches for refusing to consent, school officials told DesRoches "that he could just sit there, and [they] would talk about it later." In fact, following the threat of suspension, DesRoches was provided with at least two more opportunities to consent to the search before his suspension was actually imposed.

10

In light of the discussion thus far, it is apparent that the inception of the school's actions with respect to DesRoches occurred not when the search was first announced to the class, nor when DesRoches was threatened the first or second time with suspension, but when DesRoches was actually punished for refusing to provide his consent. So viewing the inception of the search, we agree with Appellants that, while school officials initially lacked individualized suspicion with respect to DesRoches, they developed such suspicion by virtue of their unsuccessful search of the classroom and the other eighteen students. As the facts demonstrate, those who remained in the classroom during lunch informed school officials that, to the best of their knowledge, only one student from outside the art class had entered the classroom during lunch. Therefore, once the classroom and the other eighteen students had been searched, school officials had certainly developed individualized suspicion with respect to DesRoches and the unnamed non-classmember, not by way of any particular information suggesting that one of those two was the thief, but simply by the process of elimination. We therefore cannot fault school officials for renewing their request to search once individualized suspicion had arisen, or for suspending DesRoches when he refused to consent to the search.**3**

III.

In summary, we hold that the proposed search of DesRoches's backpack was reasonable under the Fourth Amendment. The judgment of the district court is, therefore,

<u>REVERSED</u>.

_____

**3** In light of our conclusion that school officials had individualized suspicion to search DesRoches at the time he was ultimately suspended, we need not consider whether the search would also have been justified, in the absence of individualized suspicion, by "special needs" facing school officials at the time of the proposed search.