166 F.3d 243
 Joseph H. NORWOOD, individually and as representative of a
class of citizens, Plaintiff-Appellant,
v.
W.C. BAIN, Jr., individually and in his official capacity as
Director of Public Safety for the City of
Spartanburg Police Department; City of
Spartanburg, Defendants-Appellees.
Joseph H. Norwood, individually and as representative of a
class of citizens, Plaintiff-Appellee,
v.
W.C. Bain, Jr., individually and in his official capacity as
Director of Public Safety for the City of
Spartanburg Police Department; City of
Spartanburg, Defendants-Appellants.
 Nos. 96-2164, 96-2184.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 27, 1998.
Decided Jan. 8, 1999.
 
 ARGUED: W. Gaston Fairey, Fairey, Parise & Mills, P.A., Columbia, South Carolina, for Appellant. Andrew Frederick Lindemann, Ellis, Lawhorne, Davidson & Sims, P.A., Columbia, South Carolina, for Appellees. ON BRIEF: Rochelle R. McKim, Fairey, Parise & Mills, P.A., Columbia, South Carolina, for Appellant. William H. Davidson, II, James M. Davis, Jr., Ellis, Lawhorne, Davidson & Sims, P.A., Columbia, South Carolina; H. Spencer King, III, Cathy Hoefer Dunn, Leatherwood, Walker, Todd & Mann, P.C., Spartanburg, South Carolina, for Appellees.
 Before WILKINSON, Chief Judge, WIDENER, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, MOTZ, TRAXLER, and KING, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 Affirmed in part; reversed and remanded in part by published per curiam opinion. Judge WILKINS wrote a separate opinion, in which Judge WILLIAMS and Judge TRAXLER joined in its entirety, and in which Judge NIEMEYER joined in Parts I, II, and III. Judge NIEMEYER wrote a separate opinion in which Chief Judge WILKINSON, Judge WIDENER, and Judge LUTTIG joined.
 OPINION
 PER CURIAM:
 
 
 1
 This is a class action brought under 42 U.S.C. § 1983 in which it was claimed that the Fourth and Fourteenth Amendment rights of class members were violated when they were subjected to warrantless stops and physical searches at a police checkpoint set up to prevent the suspected introduction of weapons into a charity motorcycle rally in Spartanburg, South Carolina, by motorcycle gang members. The class, consisting of motorcycle riders stopped and searched at the checkpoint, sued W.C. Bain, Director of Public Safety for the City of Spartanburg, who ordered and directed the checkpoint operation, in his individual and official capacities, and the City of Spartanburg. The class members sought a declaration of constitutional violations in both the stops and searches to which they were subjected, and compensatory and punitive damages for the constitutional injuries allegedly suffered. Bain and the City denied any constitutional violation and Bain also raised the defense of qualified immunity.
 
 
 2
 Before trial, the district court, denying cross-motions for summary judgment, rejected Bain's qualified immunity defense and ruled that in setting up and directing the checkpoint, Bain was acting as the City's policy-maker so as to subject it to liability for any constitutional violation found. Following trial on the issues of liability and damages, the district court, to whom the issues were submitted for decision when the jury was unable to reach a verdict, concluded that (1) no constitutional violation occurred by reason of the temporary stops and videotaping at the checkpoint; (2) the warrantless physical searches of class members' property at the checkpoint violated their Fourth and Fourteenth Amendment rights; (3) the class members searched had proved no entitlement to compensatory or punitive damages resulting from the constitutional violation; (4) neither were they entitled under Fourth Circuit precedent to any award of nominal damages.
 
 
 3
 The class appealed, challenging the district court's ruling that the checkpoint stops and videotaping did not violate their constitutional rights and the court's ruling that they were entitled to no actual or nominal damage award for the unconstitutional searches declared by the court. The City and Bain cross-appealed, challenging the court's finding of constitutional violation by the checkpoint searches, and Bain also challenged the court's rejection of his qualified immunity defense. The City did not challenge the court's ruling that because Bain was its policy-maker in setting up and directing the checkpoint, it was liable for any resulting constitutional violation found.
 
 
 4
 On the parties' cross-appeals, a panel of this court: (1) unanimously affirmed the district court's determination that the checkpoint stops and videotaping did not violate the class members' Fourth Amendment rights; (2) by a split decision, affirmed the court's determination that the checkpoint searches did violate the Fourth Amendment rights of those class members whose property was subjected to searches; (3) by a split decision, affirmed the district court's rejection of Bain's qualified immunity defense; (4) affirmed, by majority vote, the district court's determination that the class members subjected to unconstitutional searches had proved no entitlement to compensatory or punitive damages for the violations; and (5) by majority vote, reversed the district court's ruling that those class members were not entitled to any award of nominal damages and remanded for an award not to exceed $1.00. See Norwood v. Bain, 143 F.3d 843 (4th Cir.1998). By majority vote of the active circuit judges of the court, the panel decision was later vacated, and the appeal ordered to be reheard en banc. See id. at 843.
 
 
 5
 Having now reheard the appeal en banc, the judgment of the en banc court is as follows:
 
 
 6
 Checkpoint Stop and Videotaping: Affirmed by unanimous vote of the court for reasons given in the vacated panel decision. See id. at 848-50.
 
 
 7
 Search of Saddlebags and Unworn Clothing: Affirmed by an equally divided vote of the court. Judges Murnaghan, Ervin, Hamilton, Michael, Motz, King, and Phillips voted to affirm. Chief Judge Wilkinson and Judges Widener, Wilkins, Niemeyer, Luttig, Williams, and Traxler voted to reverse.
 
 
 8
 Qualified Immunity: Affirmed by an equally divided vote of the court. Judges Murnaghan, Ervin, Hamilton, Michael, Motz, King, and Phillips voted to affirm. Chief Judge Wilkinson and Judges Widener, Wilkins, Niemeyer, Luttig, Williams, and Traxler voted to reverse.
 
 
 9
 Compensatory and Punitive Damages: Affirmed by a unanimous vote of the court.
 
 
 10
 Nominal Damages: Reversed by majority vote of the court for reasons given in the vacated panel decision. See id. at 856. Judges Murnaghan, Ervin, Wilkins, Hamilton, Williams, Michael, Motz, Traxler, King, and Phillips voted to reverse. Chief Judge Wilkinson and Judges Widener, Niemeyer, and Luttig voted to affirm.
 
 
 11
 Accordingly, the judgment of the district court is affirmed in part and reversed in part, and the case is remanded to the district court for entry of a judgment in accordance with this opinion that includes an award of nominal damages to the plaintiff class against Bain and the City not exceeding $1.00 for the constitutional violation found by the district court.
 
 
 12
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
 
 WILKINS, Circuit Judge, writing separately:
 
 13
 A conclusion that law enforcement officers cannot, consistent with the Fourth Amendment, attempt to avert a concrete threat of great public harm with a relatively unobtrusive and appropriately effective warrantless search not supported by individualized suspicion and not undertaken for law enforcement purposes creates an unnecessary risk to public safety and is directly contrary to Supreme Court precedent. I write separately to explain why the district court and seven members of this court erred in concluding that Spartanburg, South Carolina police officers[1] violated the Fourth Amendment rights of Plaintiffs by searching their motorcycle saddlebags and unworn clothing as they entered a fairgrounds for a charity motorcycle rally: Spartanburg's interest in protecting public safety by preventing members of warring motorcycle gangs from carrying concealed weapons into a crowded public event, the extent to which the search reasonably was thought to advance that interest, and the modest degree of intrusion upon those individuals who were subject to the search plainly support a conclusion that the search was reasonable. Furthermore, because it was not clearly established in September 1994, when the rally took place, that this search was unreasonable--indeed, circuit authority indicated that the search was constitutional--Chief Bain is entitled to qualified immunity.I. Facts
 
 
 14
 In May 1994, organizers began planning a motorcycle rally to benefit the American Red Cross to be held in September 1994 at a fairgrounds in Spartanburg. Organizers requested that Spartanburg provide assistance with security for the event. Although Spartanburg officials initially believed that off-duty officers would be adequate to maintain order at the rally, as the event neared, information came to light indicating that thousands of members of two rival motorcycle gangs with a past history of violent confrontations--the Hell's Angels and the Pagans--were planning to attend. Based on this information, Chief Bain directed all available officers in his department to work on the day of the rally and ultimately assigned 75 officers to the event.
 
 
 15
 On the day of the rally, a checkpoint was established on a public street outside an entrance to the fairgrounds. The checkpoint was visible to those approaching the fairgrounds, and persons on motorcycles were informed that they could enter the fairgrounds on foot without passing through the checkpoint if they parked their motorcycles in the parking lot. Officers were instructed to allow anyone to walk freely through the gates. However, persons on motorcycles were stopped, their driver's licenses were examined and videotaped, and their motorcycle saddlebags and unworn clothing were searched for weapons. The officers did not conduct searches of worn clothing or of the riders. Although officers originally had planned to conduct magnetometer screenings, the metal in the motorcycles rendered the magnetometer ineffective, and its use soon was abandoned in favor of searches of the saddlebags and unworn clothing. The officers conducted searches of the saddlebags by asking the riders to open their saddlebags and by then looking inside. In some cases, this procedure also involved removing articles from the saddlebags, while in others the officers merely felt around inside the saddlebags. At the conclusion of the searches, riders were allowed to enter the fairgrounds. The total process for each motorcycle lasted from one to two minutes. The officers were at all times prompt and polite, wishing the riders a good day as they entered the fairgrounds.
 
 
 16
 Plaintiffs brought this action claiming in pertinent part that their Fourth Amendment rights had been violated in various ways by the checkpoint and search procedure and seeking injunctive and monetary relief. Specifically, Plaintiffs claimed that stopping them at the checkpoint and subjecting them to videotaping was an unreasonable seizure of their persons and that the ensuing inspection of their motorcycle saddlebags and unworn clothing was an unreasonable search of their property.
 
 
 17
 The district court denied cross-motions for summary judgment, including Chief Bain's assertion of qualified immunity. After the jury that heard the trial evidence was unable to reach a verdict, the parties agreed to allow the district court to decide the case based on the evidentiary record presented. The district court concluded that the initial seizure of Plaintiffs at the checkpoint, where they and their driver's licenses were videotaped, was reasonable and thus did not violate the Fourth Amendment. The court further determined that the searches of Plaintiffs' motorcycle saddlebags and unworn clothing were unreasonable in light of the lack of individualized suspicion. Finding insufficient evidence of compensatory or punitive damages, however, the court declined to award any monetary relief, including nominal damages, for that violation.
 
 II. Search of Saddlebags and Unworn Clothing
 
 18
 The guarantee of privacy and security from unreasonable governmental intrusion provided by the Fourth Amendment long has been recognized as fundamental to the maintenance of a free society. See Camara v. Municipal Ct., 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The Fourth Amendment provides:
 
 
 19
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 20
 U.S. Const. amend. IV.[2] Simply put, this amendment guarantees that governmental intrusions into privacy by means of searches or seizures will be reasonable. Typically, this reasonableness requirement acts as a constraint on governmental authority to undertake a search or seizure in the absence of individualized suspicion. See Chandler v. Miller, 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). In addition, a search performed without a warrant is unreasonable per se unless it fits within a narrowly defined exception to the warrant requirement. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); United States v. Lattimore, 87 F.3d 647, 650 (4th Cir.1996) (en banc). Nevertheless, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Instead, a determination of reasonableness compels a weighing of the governmental interest prompting the invasion; the effectiveness of the intrusion, i.e., the degree to which the intrusion reasonably is thought to advance the governmental interest; and the magnitude of the intrusion upon the individuals affected, from both a subjective and objective standpoint. See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); id. at 451-55, 110 S.Ct. 2481 (applying test); Von Raab, 489 U.S. at 665-66, 109 S.Ct. 1384 (explaining that when "a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context"); DesRoches v. Caprio, 156 F.3d 571, 574 (4th Cir.1998). Compare United States v. Davis, 482 F.2d 893, 908-12 (9th Cir.1973) (explaining that an entry search at an airport was not unconstitutional despite a lack of individualized suspicion or warrant, because a very real chance of danger to the public existed from allowing concealed weapons or explosives onto a commercial airliner, the search method was effective, the degree of intrusion was the least possible to accomplish the goal, and all those entering were subjected to the same treatment), with Wheaton v. Hagan, 435 F.Supp. 1134, 1145-46 (M.D.N.C.1977) (holding that random pat-down searches and searches of purses and clothing for weapons, drugs, and alcohol by officers stationed at the doors of a coliseum were not constitutional because there was little public necessity; the searches were not an effective deterrent; and the degree of intrusion was high and was exacerbated by the fact that officials exercised discretion concerning whom to search). Here, the question is whether consideration of Spartanburg's interest in public safety, the effectiveness of the search, and the intrusion experienced by the individuals who entered the rally on motorcycles and whose motorcycle saddlebags and unworn clothing were searched weighs in favor of a conclusion that the search was violative of the Fourth Amendment.
 
 A.
 
 21
 The first factor to be considered is the governmental need. "[T]he proffered special need ... must be substantial--important enough to override the individual's acknowledged privacy interest[ and] sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." Chandler, 520 U.S. at 318, 117 S.Ct. 1295. The hazard giving rise to the alleged special need must be a concrete danger, not merely a hypothetical one. See id. at 318-19, 117 S.Ct. 1295. Although evidence that the problem has manifested itself previously is not always necessary to demonstrate the concreteness of the potential harm, such evidence bolsters an argument that a harm is sufficiently tangible to give rise to a special need. See id. at 319, 117 S.Ct. 1295. Compare Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 606-08, 620-21, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (holding that a concrete special need existed for random drug testing in part because of evidence of drug and alcohol abuse by railroad employees), and Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 662-63, 115 S.Ct. 2386, 132 L.Ed.2d 564(1995) (explaining that a sharp rise in drug use by student athletes supported school officials' assertion that random drug testing without individualized suspicion was warranted), with Chandler, 520 U.S. at 318-19, 117 S.Ct. 1295 (noting that Georgia failed to demonstrate concrete harm to support drug testing of candidates for public office in absence of evidence that Georgia had a particular problem with state officeholders abusing drugs).
 
 
 22
 Here, there can be no dispute that Spartanburg possessed a significant quantity of reliable information indicating a very real possibility of an extremely dangerous situation--an armed confrontation between large numbers of violent, rival motorcycle gang members at a public event. First, Officer Carl McKinney learned from a coworker who had been involved with a motorcycle gang that a confrontation between the Hell's Angels and the Pagans was planned during the rally and that because the gang members intended to "drop their colors,"[3] law enforcement officers would not be able to identify them as gang members and thus they would be able to infiltrate the gathering more easily. McKinney passed this information along to his superiors. Second, Lieutenant Ron Cook, an expert on motorcycle gangs who was employed by the South Carolina Law Enforcement Division (SLED), advised Spartanburg that the Hell's Angels and the Pagans were engaged in an ongoing conflict for territorial control of South Carolina. He further advised that this turf struggle had led to at least two violent public altercations among gang members during the past several months, one in South Carolina and one in New Jersey. According to Cook, the Pagans had threatened retribution following these incidents. Cook further informed Spartanburg that motorcycle gang members often carry weapons concealed in their motorcycle saddlebags.[4] Third, one of the chairpersons of the event requested that Spartanburg officers investigate an individual who the chair had learned was planning to attend the event. This investigation disclosed that the individual was a known member and organizer of the Hell's Angels. The chairperson later informed Spartanburg that this individual had expressed an interest in the rally, but would not commit concerning whether the Hell's Angels would attend. Fourth, in the weeks prior to the rally, Cook learned from a Virginia State Police intelligence report that the Pagans had been directed by their leadership to make a mandatory ride to an undisclosed location on the day prior to the Spartanburg rally. Further, Cook received information that the Hell's Angels would be attending a rally in Cherokee, North Carolina scheduled for the same weekend as the Spartanburg rally and that the group planned to attend the Spartanburg rally after leaving North Carolina. Finally, on the evening before the event, one of the chairpersons of the rally telephoned a Spartanburg official to advise him that as many as 3,000 to 4,000 bikers from the Cherokee rally were going to converge on the South Carolina event and to express concerns regarding security. Under these circumstances, it cannot be seriously disputed that the governmental interest at stake was an extremely grave and genuine matter of public safety.
 
 
 23
 Plaintiffs argue that the searches here are analogous to administrative searches conducted at airports and courthouses that have been upheld as constitutionally permissible. See, e.g., United States v. Edwards, 498 F.2d 496, 498-500 (2d Cir.1974) (upholding constitutionality of airport searches); Downing v. Kunzig, 454 F.2d 1230, 1232-33 (6th Cir.1972) (concluding that search prior to entering courthouse passed constitutional muster). However, Plaintiffs assert, the search here is not supported by the type of demonstrated, nationwide threat of harm that justifies airport and courthouse searches. Rather, Plaintiffs maintain, because the nature of the harm here was local and episodic, the public interest in the searches was far less than that supporting blanket searches at airports and courthouses.
 
 
 24
 Of course, it is correct that the type of harm presented here is different in scope from that justifying searches at airports and courthouses, but so is the scope of the search undertaken. I do not suggest that the danger faced by Spartanburg would warrant checkpoint searches at all motorcycle rallies nationwide or at all large public events conducted in Spartanburg. More importantly, in assessing the reasonableness of a search made not for law enforcement purposes, but for a special need, the Supreme Court has never suggested that a harm must be perceived to be nationwide in scope. Instead, the Court has made plain that no "minimum quantum of governmental concern" is required to justify a special needs search and that the level of interest must be "important enough to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy." Vernonia Sch. Dist. 47J, 515 U.S. at 661, 115 S.Ct. 2386 (emphasis omitted). Indeed, the Court has upheld the reasonableness of special needs searches when only local dangers were presented. See id. at 648-50, 660-65, 115 S.Ct. 2386 (holding that a drug problem among student athletes in a small school district was a sufficiently compelling special need to justify a random drug testing program for the student athletes without a warrant or individualized suspicion);see also Wilkinson v. Forst, 832 F.2d 1330, 1337-38, 1340 (2d Cir.1987) (concluding that "when an organization with a ... demonstrable penchant for violence plans a rally which is to be attended by opposition groups who have historically clashed," and when violence is anticipated, the need for a limited blanket search is adequate to support such a search without individualized suspicion).
 
 
 25
 Plaintiffs also suggest that a special needs search is not reasonable unless the public interest supplying the basis for the search has been identified and approved by a legislative or administrative body rather than perceived by law enforcement officers. See, e.g., Edwards, 498 F.2d at 498-500 (upholding airport searches conducted pursuant to federal regulations); Downing, 454 F.2d at 1232-33 (concluding that courthouse searches undertaken pursuant to federal regulations do not violate the Fourth Amendment). But, the Supreme Court has never intimated that a special needs search cannot be reasonable in the absence of legislative or administrative approval. Moreover, a rule that a special need cannot support a search unless the potential harm justifying the search has been identified in public records would be artificial and unworkable. Undoubtedly, a warrantless search designed to avert great harm that may be avoided only by an extremely limited and unintrusive type of search applied in a very evenhanded manner is not unreasonable simply because it is not authorized by a legislative or regulatory scheme. Rather, the genuineness and substantiality of the need for the search must be evaluated on a case-by-case basis. See Chandler, 520 U.S. at 318-19, 117 S.Ct. 1295 (looking to the record for evidence of a concrete danger to support drug testing of candidates for state office); Von Raab, 489 U.S. at 668-71, 109 S.Ct. 1384 (discussing the unique circumstances faced by employees of the United States Customs Service who are involved in drug interdiction or who must carry firearms).
 
 
 26
 For example, suppose law enforcement officials received reliable information that two individuals were transporting a large quantity of explosives by vehicle into a designated city by a specified route in order to blow up a museum where a popular, but controversial, exhibit was on public display. Obviously, under these facts, an enormous danger to public safety would exist that could be averted only by intercepting the would-be bombers. The Constitution would permit law enforcement officers to stop all motorists traveling into the area on the identified route and conduct cursory searches of the interiors and trunks of the vehicles because the severity of the harm, the effectiveness of the proposed response, and the minimal intrusion to the individuals subjected to a search weigh in favor of that conclusion.
 
 
 27
 Similarly, under the circumstances presented here, a special governmental interest existed in protecting the public. Spartanburg possessed concrete information that armed, rival motorcycle gangs, the members of which could not be identified, planned to attend the rally. And, the potential for the eruption of violence appeared real in light of past altercations between the two groups. Given the large number of participants expected for the rally and the potential for a massive, violent confrontation, Spartanburg clearly possessed a genuine and substantial need to safeguard the public.
 
 B.
 
 28
 The second factor, the effectiveness of the search, focuses on "the degree to which [it] advances the public interest." Sitz, 496 U.S. at 453, 110 S.Ct. 2481 (internal quotation marks omitted). Compare Chandler, 520 U.S. at 319, 117 S.Ct. 1295 (noting that "Georgia's certification requirement [was] not well designed to identify candidates who violate antidrug laws" because the testing date was known in advance so that abusers could refrain from using drugs prior to the test), with Vernonia Sch. Dist. 47J, 515 U.S. at 663, 115 S.Ct. 2386 (explaining that random drug testing of student athletes was an effective means of addressing a drug abuse problem in the student body as a whole because the problem resulted at least in part from students' imitation of the student athletes' drug use). In analyzing this factor, however, our review must leave "the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger" to "the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." Sitz, 496 U.S. at 453-54, 110 S.Ct. 2481.
 
 
 29
 There can be little question that searching Plaintiffs' motorcycle saddlebags and unworn clothing was an effective means of preventing the type of weapons motorcycle gang members purportedly were carrying from finding their way into the public fairgrounds. Indeed, no less intrusive law enforcement effort would have worked as well. Because the magnetometers the officers first attempted to employ in order to avoid individualized searches were ineffectual, an effective method of search less intrusive than the one eventually employed was not possible. And, without the checkpoint search, Spartanburg would not have obtained individualized suspicion that specified persons possessed weapons until the gang members already had entered the fairgrounds, become a part of the large crowd, and brandished or used their weapons. By that time, the threat of a violent confrontation would have been fully realized. See Davis, 482 F.2d at 910 (noting in support of conclusion that airport searches are constitutional that "[l]ittle can be done to balk the malefactor after [weapons or explosives are] successfully smuggled aboard[ a commercial aircraft], and as yet there is no foolproof method of confining the search to the few who are potential hijackers"). The presence of a large law enforcement contingency to quell a disturbance after one had begun would not have been an effective means of preventing the tumult once weapons had been introduced to the rally.
 
 
 30
 Furthermore, the fact that individuals were permitted to walk into the fairgrounds without being searched provided that they parked their motorcycles outside the fairgrounds does not mean that the search method employed was ineffective.[5] The information available to Spartanburg indicated that motorcycle gang members frequently carried weapons in their motorcycle saddlebags. Thus, it was reasonable for Spartanburg to conclude that the likelihood of the transportation of weapons into the fairgrounds was less for individuals who parked their motorcycles outside and walked to the rally. And, it is important to realize that these weapons could not have been concealed easily in the tight t-shirts and blue jeans--or less--worn by the majority of the bikers on that very hot September afternoon. Additionally, Spartanburg reasonably could have concluded that individuals riding motorcycles into the fairgrounds would be more likely to convey weapons into the rally than those lacking a ready means of escape. Further, even if reasonable law enforcement officials could have concluded that a search of the individuals entering the fairgrounds on foot as well as those entering on motorcycle would have been more thorough, it is not within our province to question the decisions of officials concerning a choice of law enforcement techniques among reasonable alternatives.
 
 C.
 
 31
 Finally, the degree of intrusion, both objective and subjective, suffered by individuals submitting to the search was minimal. The objective intrusion suffered by an individual is "measured by the duration of the seizure and the intensity of the investigation." Sitz, 496 U.S. at 452, 110 S.Ct. 2481. The subjective level of intrusion measures how the method chosen minimizes or enhances fear and surprise on the part of those searched or detained. See id.
 
 
 32
 Here, the intrusion experienced by Plaintiffs was slight. The searches were very brief and evenhanded, and the searching officers evinced the utmost respect for Plaintiffs. Furthermore, the intrusiveness of the search was lessened by the fact that the entrants to the fairgrounds were informed that they would be subjected to the search only if they wished to enter on motorcycle and would be permitted to enter without a search if they chose to park their motorcycles and enter as pedestrians. Also, all of those who entered the fairgrounds on motorcycles with saddlebags and unworn clothing were subjected to the search; the decision to search was not left to the discretion of the officers. See id. 452-53, 110 S.Ct. 2481 (explaining that a checkpoint search where all entrants are searched is considerably less intrusive than a search by roving patrols that exercise discretion over whom to stop and search);see also United States v. Martinez-Fuerte, 428 U.S. 543, 565-66, 96 S.Ct. 3074, 49 L.Ed.2d 1116(1976) (concluding "that the visible manifestations of the field officers' authority at a checkpoint provide substantially the same assurances" that investigators are acting lawfully as does a warrant and that the need for a warrant to accomplish the warrant requirement's purpose of substituting the judgment of a detached neutral decisionmaker for that of officers in the field is reduced when the field officers' discretion is subordinated "to the administrative decisions of higher ranking officials"); Turner v. Dammon, 848 F.2d 440, 446-47 (4th Cir.1988) (explaining that "[t]he cases upholding warrantless administrative searches clearly establish that these rules require certainty, regularity, and neutrality in the conduct of the searches"). Accordingly, the searches were minimally intrusive.
 
 D.
 
 33
 In sum, a genuine and substantial threat to public safety existed that created a special need beyond that of the traditional law enforcement goals of apprehension and detection of criminal conduct; the method chosen to address that need effectively advanced the public interest, which could not have been promoted as well by a scheme requiring individualized suspicion or a warrant; and the intrusion suffered by those individuals who submitted to the search was minimal. Therefore, a balancing of these factors clearly demonstrates that the search conducted was reasonable and thus not violative of the Fourth Amendment.[6]III. Qualified Immunity
 
 
 34
 While I have no doubt that the search was within constitutional bounds, I do recognize that there is no precedent directly on all fours with these facts and therefore at least an argument can be constructed to the contrary. However, it strains all reason for one to conclude that Chief Bain is not entitled to qualified immunity.
 
 
 35
 Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." E.g., Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271(1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing brightlines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992). Thus, although the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir.1992) (explaining that "[t]he fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was nevertheless 'clearly established' for qualified immunity purposes" and that " '[c]learly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked"). As we recently reiterated, the law is clearly established such that an officer's conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state in which the action arose. See Jean v. Collins, 155 F.3d 701, 709 (4th Cir.1998) (en banc).
 
 
 36
 In analyzing an appeal from the rejection of a qualified immunity defense, the first task of the court is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct. See Taylor v. Waters, 81 F.3d 429, 433 (4th Cir.1996). The court then must consider whether, at the time of the claimed violation, that right was clearly established and " 'whether a reasonable person in the official's position would have known that his conduct would violate that right.' " Id. (quoting Gordon v. Kidd, 971 F.2d 1087, 1093 (4th Cir.1992)). Review by this court of the denial of summary judgment based on qualified immunity is de novo. See Pritchett, 973 F.2d at 313.
 
 
 37
 The constitutional right that Plaintiffs claim was violated, defined at the appropriate level of specificity, is their Fourth Amendment right to avoid individualized searches of their motorcycle saddlebags and unworn clothing performed prior to entering the rally for the purpose of detecting weapons when reliable information indicated that a real and imminent danger existed that armed members of warring motorcycle gangs planned to attend the rally and when Plaintiffs were informed that they would not be searched unless they chose to enter the fairgrounds on their motorcycles. The qualified immunity question presented, then, is whether in September 1994 this right was clearly established and whether a reasonable officer would have understood that the conduct at issue violated it.
 
 
 38
 By September 1994, the Supreme Court had announced that the balancing test discussed above was the appropriate one to assess the reasonableness of a search conducted for a special need unrelated to law enforcement and without individualized suspicion or a warrant. See Sitz, 496 U.S. at 449-50, 110 S.Ct. 2481. But, it is undisputed that when this incident took place there was no clear law from the Supreme Court, this court, or the South Carolina Supreme Court holding that a search fails to pass constitutional muster under the Fourth Amendment as a special needs search when officers conduct a search at a checkpoint--without individualized suspicion or a warrant--and a grave matter of public interest is at stake, an effective means of preventing that harm is available, and the searching technique employed is relatively unintrusive. Cf. Wilkinson, 832 F.2d at 1342 (holding officers were entitled to qualified immunity on similar facts because law not clearly established). Absent controlling authority indicating that a search conducted under these circumstances would be violative of the Fourth Amendment, a reasonable law enforcement officer may well have concluded that this type of search was constitutional. See Gruenke v. Seip, No. 97-5454, 1998 WL 734700, at * 8 (E.D.Pa. Oct. 21, 1998) (holding that a high school swimming coach was entitled to qualified immunity in an action alleging that he violated a student's Fourth Amendment rights by forcing her to take a pregnancy test because the application of the special needs balancing test to the facts presented was not clearly established in 1997).
 
 
 39
 Moreover, prior to September 1994, this circuit had expressly held that one who submits to a checkpoint search in order to gain entry into an area after having been informed of the right to leave impliedly consents to the search. See United States v. Haynie, 637 F.2d 227, 230-31 (4th Cir.1980); United States v. DeAngelo, 584 F.2d 46, 47-48 (4th Cir.1978). In DeAngelo, this court upheld the constitutionality of a search conducted of passengers entering a boarding area at an airport as a valid consent search. See DeAngelo, 584 F.2d at 47-48. The court focused on the facts that a sign informed passengers that they would be searched if they entered and that nothing forced the passengers to enter. See id. Here, it is undisputed that those seeking entry into the fairgrounds were informed that they need not be searched and that they could enter the fairgrounds without submitting to a search by parking their motorcycles and walking into the rally. Accordingly, a reasonable officer in September 1994 could--indeed, would--have believed that those entering the fairgrounds impliedly consented to the search.
 
 
 40
 A reasonable law enforcement officer could not have known in September 1994 that Plaintiffs' Fourth Amendment rights would be violated by a search of their motorcycle saddlebags and unworn clothing as they entered the rally after being informed that they would not be searched unless they chose to enter the fairgrounds on their motorcycles. Therefore, Chief Bain is entitled to qualified immunity.
 
 IV. Damages
 
 41
 Generally, when a court determines that a defendant has no liability, the court need not reach any questions of damages. See, e.g., DeCarlo v. Fry, 141 F.3d 56, 62 (2d Cir.1998); Berry v. Battey, 666 F.2d 1183, 1187 (8th Cir.1981); Adams v. Standard Knitting Mills, Inc., 623 F.2d 422, 425 (6th Cir.1980); cf. Bazemore v. Friday, 478 U.S. 385, 387 n. 2, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (per curiam) (stating that in light of the determination that defendants had no liability, question of whether lower court properly refused to certify a plaintiff class was moot). Here, however, the vote of the fourteen judges sitting en banc was evenly divided, and therefore, the holding of the district court that the search of the motorcycle saddlebags and unworn clothing was unconstitutional is affirmed. See Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 234 n. 7, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 126 (4th Cir.1995). Consequently, the damages issues continue to present a live controversy for decision that I believe we are compelled to address.[7] See Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483(1976) (explaining that federal courts have "the virtually unflagging obligation ... to exercise the jurisdiction given them"); Spann v. Martin, 963 F.2d 663, 673 (4th Cir.1992) (noting that a "court has a duty to decide cases within its jurisdiction"). Thus, despite my conclusion that Spartanburg committed no constitutional violation, I am not free at this juncture to refuse to address the damages issues or to resolve those issues in a legally incorrect way in order to reach a result consistent with my belief that no liability should have attached. Rather, I must accept that the underlying issues of liability have been established contrary to the way that I believe to be correct and resolve the damages issues accordingly. See Arizona v. Fulminante, 499 U.S. 279, 295, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
 
 
 42
 Therefore, the damages questions presented are whether the district court erred in failing to award compensatory, punitive, or nominal damages given that a constitutional violation has been held to have occurred. For the reasons set forth in the panel opinion, I would affirm the decision of the district court holding that Plaintiffs failed to present adequate evidence to support an award of compensatory or punitive damages. See Norwood v. Bain, 143 F.3d 843, 855-56 & n. 11 (4th Cir.1998). And, I would reverse the decision of the district court that Plaintiffs are not entitled to nominal damages. See id. at 856; Price v. City of Charlotte, N.C., 93 F.3d 1241, 1256 (4th Cir.1996).
 
 V. Conclusion
 
 43
 In sum, I would hold that the search of Plaintiffs' motorcycle saddlebags and unworn clothing did not violate the Fourth Amendment. Additionally, I would hold that Chief Bain is entitled to qualified immunity. A contrary conclusion imposes an alarming restraint on efforts by law enforcement officials to protect public safety.
 
 
 44
 Judge Williams and Judge Traxler join in this separate opinion in its entirety; Judge Niemeyer joins in Parts I, II, and III of this opinion.
 
 NIEMEYER, Circuit Judge, writing separately:
 
 45
 For the reasons given in Part II of Judge Wilkins' separate opinion, I conclude that the searches in this case do not violate the Fourth and Fourteenth Amendments. Moreover, I firmly believe, for the reasons given in Part III of Judge Wilkins' opinion, that W.C. Bain, Jr. cannot in any event be personally liable. Against the then existing state of law, I do not understand how we could rationally conclude that Bain was either "plainly incompetent" or that he "knowingly violate[d] the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). His decision to conduct the searches was made in good faith against the gray background of administrative-search jurisprudence for the safety of the community, and we have previously noted that "bad guesses in gray areas" do not subject law enforcement officers to personal liability. Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992). In this case, I do not believe that Bain even made a bad guess, even though to guess was his only option.
 
 
 46
 Because of my position on liability, I conclude that no award of damages is appropriate in this case.
 
 
 47
 For these reasons, I would affirm the district court's conclusion that temporary stops and their videotaping was lawful; I would reverse the district court's conclusion that the physical searches of motorcycle bags were unlawful; and I would affirm its refusal to award any damages.
 
 
 48
 Chief Judge Wilkinson, Judge Widener, and Judge Luttig have authorized me to report that they join in this opinion.
 
 
 
 [1]
 Plaintiffs named as Defendants the City of Spartanburg and W. C. Bain, Jr., individually and in his official capacity as the Chief of the Spartanburg Police Department. For ease of reference, I refer to Defendants collectively as "Spartanburg."
 
 
 [2]
 The Fourth Amendment is enforceable against the states through the Fourteenth Amendment. See Ker v. California, 374 U.S. 23, 30, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963)
 
 
 [3]
 "Colors" are insignia worn to identify membership in a particular motorcycle gang. When members of a motorcycle gang "drop their colors," these insignia are not worn so that identification of the gang members is more difficult
 
 
 [4]
 Cook indicated that the weapons likely to be carried were ball peen hammers with leather straps, large wrenches, and firearms
 
 
 [5]
 It is worth noting that Cook was stationed outside the pedestrian entrance gate to attempt to identify any notorious gang members entering on foot
 
 
 [6]
 The decision of the Supreme Court in United States v. Ortiz, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), and the decision of this court in United States v. Gallagher, 557 F.2d 1041 (4th Cir.1977) (per curiam), are not to the contrary. In Ortiz, in addressing whether a checkpoint search of vehicles for illegal aliens that was not conducted at the border or its functional equivalent was constitutional, the Supreme Court remarked that "at traffic checkpoints removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause." Ortiz, 422 U.S. at 896-97, 95 S.Ct. 2585. In Gallagher, we echoed this concern stating:
 [There is a] long-recognized distinction between border searches and those taking place in interior locations. "Travellers may be... stopped in crossing an international boundary because of national self protection...." Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925). "[S]earches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well." Almeida-Sanchez v. United States, 413 U.S. 266, 272, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). At points other than the border or its functional equivalent, however, officers may not search private vehicles absent consent or probable cause.
 Gallagher, 557 F.2d at 1043 (parallel citations omitted) (second & fourth alterations in original).
 Despite their broad language, Ortiz and Gallagher can be distinguished. First, Ortiz did not apply the Sitz balancing test, and an application of that test to the facts presented in Ortiz leads to the conclusion that the searches at issue there were violative of the Constitution. More importantly, Ortiz confronted a search justified by illegal immigration and thus does not control when other justifications are offered in support of a search. In Gallagher, this court made clear that the search at issue was a border search, so statements by the court concerning searches conducted away from the border were mere dictum.
 
 
 [7]
 As a concurring and dissenting member of the panel, see Norwood v. Bain, 143 F.3d 843, 859 (4th Cir.1998) (Wilkins, J., concurring in part and dissenting in part), I was not compelled to address separately the damages issues because all of the live controversies presented to the court had been resolved by the majority